[Sac. No. 6136. In Bank. Apr. 24, 1952.]

ARVID G. ANDERSON et al., Respondents, v. JOHN J. SOUZA et al., Appellants.

826

Donald B. Fowler and H. E. Gleason for Appellants.

Brown, Brown & Bacon, Ralph M. Brown, William E. Bacon and T. M. Norton for Respondents.

THE COURT.—This appeal is from a judgment enjoining the operation of an airport and awarding damages. After decision by the District Court of Appeal, Third Appellate District, a hearing was granted by this court to give further consideration to the important issues involved. We have concluded that the opinion of the District Court of Appeal, prepared by Mr. Justice Van Dyke, correctly discussed and decided the issues presented. That opinion, with additions and deletions, is adopted as the opinion of this court. As modified, the opinion is as follows:

"Plaintiffs below, more than 50 in number, brought this action against defendants to recover damages by reason of the alleged creation and maintenance of a nuisance through the operation of an airport, and for injunctive relief forbidding the defendants to operate the airport as such. The court, adopting in the main the allegations of the complaint, made the following findings of fact: That since April 19, 1946, plaintiffs were the owners of and resided on real property located close to the airport; that during that period of time the defendants operated the airport, defendants Souza and wife being the owners of the real property on which the airport is located; that in the course of the operation of the airport numerous aircraft of various types taxi, take off, circle, buzz, cruise about, maneuver, glide, climb, bank, turn, stunt and engage in acrobatics, and land on, from, and to said airport; that this aerial activity is continuous and frequent throughout the daylight hours and that the aircraft are operating with the consent, encouragement and solicitation of the defendants; that many of the airplanes so operated belong to defendants and are operated by them; that the airplanes fly over the homes of the plaintiffs at heights varying from 25 to 800 feet and in passing over or near said homes create such a tremendous noise that the same interferes with the lawful use, enjoyment and occupancy of the dwellings to the great disturbance and nervous upset of the plaintiffs; that because of said noises plaintiffs and members of their families are unable to sleep when planes from the airport are operating, to their great physical detriment and mental anguish; that normal conversation is interrupted; that plaintiffs have great difficulties listening to radio programs and in general the enjoyment of their homes is materially decreased; that plaintiffs, knowing that numerous airplane accidents have occurred throughout the country and that several have

occurred at the airport, suffer great fear and apprehension when the airplanes pass over their homes at low altitudes; that defendant Earlandson operates a flying school at the airport, and the student pilots using airplanes belonging to Earlandson fly at low altitudes over plaintiffs' homes, but that only six plaintiffs were affected by the conduct of the student pilots and that, as to the six, such conduct placed their lives and property in great jeopardy and caused them to fear greatly for their property, their lives and the lives of their loved ones; that the real property of the same six plaintiffs by reason of said conditions has depreciated in value, but that this was not true as to the other plaintiffs; that plaintiffs have often requested and demanded of defendants that they cease operating the airport and the airplanes in the manner found, but that defendants have continued to operate them in said manner continuously from April, 1946, to the time of trial; that more airplanes are operating from the field each month and that still more airplanes will operate from the field in the future; that defendants by their acts have caused irreparable injury to plaintiffs and that irreparable injury will be done to them in the future if the defendants continue with their acts as found; that none of the plaintiffs have been damaged except the same six and that they have been damaged as follows, V. E. Anderson and wife jointly in the sum of $500, Arvid G. Anderson and wife jointly in the same sum, and Jack Harlan and wife jointly in the same sum; that plaintiffs have no plain, speedy or adequate remedy at law. As conclusions of law from the facts found judgment was ordered: 1. Enjoining and restraining the defendants from operating the airport on the premises described in the complaint; 2. For damages in the sum of $500 to each of the three couples named above. Judgment was entered accordingly. Motion for new trial was made and denied. From the judgment the defendants have taken this appeal.

"We shall discuss the contentions of appellants *seriatim* as they advance them in their briefs. Appellants first attack the finding of the court that appellants Souza and wife, along with appellant Earlandson, operate the airport. Herein it is claimed on behalf of Souza that it is Earlandson who operates the airport and that Souza, while he owns the property where the airport is located, has leased the airport to Earlandson, and that, therefore, under such cases as *Gould* v. *Stafford*, 91 Cal. 146 [27 P. 543], *Wiersma* v. *City of Long Beach*,

41 Cal.App.2d 8 [106 P.2d 45], *Mundt* v. *Nowlin*, 44 Cal. App.2d 414 [112 P.2d 782], and *Meloy* v. *City of Santa Monica*, 124 Cal.App. 622 [12 P.2d 1072], the nuisance complained of is created and maintained by Earlandson alone. ■ These cases lay down the well-known rule that a landlord is not responsible to other parties for the misconduct or injurious acts of his tenant to whom his estate has been leased for a lawful and proper purpose when there is no nuisance or illegal structure upon it at the time of the leasing. ■ We think, however, that in view of the evidence here this rule and the cases declaring it are not controlling, for it was shown that Souza owned the land, constructed the field, obtained the county permit, flew his own plane from and to the field and retained portions of the field's facilities, that is, the hangars and tie-down space for which he collected rent. Earlandson's rights were to operate his flying school, sell gas and repair planes. Earlandson, therefore, was not in sole charge of the field and it is a fair inference from the evidence that Souza at least joined with Earlandson in permitting public use of the field, and, in short, so participated in the operation of the field that the court's findings that he and Earlandson operated the field are substantially supported by the evidence.

■ "There is next attacked the finding that 'many airplanes' operating from the airport were owned and operated by appellants Souza and Earlandson as being contrary to the evidence. We think this finding is sufficiently supported by Souza's testimony that he owned and operated a plane and by Earlandson's testimony that he owned and operated four airplanes, plus one which he operated for another owner. Whether such numbers constitute many or few is a comparative matter, but Earlandson's planes were shown to have been greatly used in the conduct of his air school and in view of the fact of dual control and operation of the port by the two men we find nothing erroneous in the challenged finding. . . .

"Appellants contend that the court erred in decreeing any judgment either for damages or by way of injunctive relief against defendant Souza. This is but another aspect of the contention previously discussed, which was based upon the theory that Souza, having leased the airport, did not operate the same, and we think separate treatment is unnecessary. What we have said heretofore disposes of this contention.

832

■ "Appellants contend that the court erred in allowing one of the respondents to testify from and read verbatim into the record a memorandum he had prepared without requiring, as they contend, a proper foundation therefor to be laid. It appears that the length of time covered by the testimony taken was quite considerable, in fact, several years in extent. The witness had from time to time over a considerable period of time and on observing airplanes flying low over his home or near to it and over his property made notations in whatever way was open to him at the time, consisting of a description of the plane, its numbers and such like matters. He made these notations on scratch paper he may have had with him at the time. Sometimes he entered them upon fence posts and even at times inscribed them on the surface of the ground. He then collected these memoranda and, as he testified, copied the same into more permanent form and either from these latter writings or from other writings copied from them in turn, he was permitted to testify over objections. Section 2047 of the Code of Civil Procedure covers the matter. It provides that a witness is allowed to refresh his memory by anything written by himself or under his direction at the time when the fact occurred or immediately thereafter or while still fresh in his memory, if he knows the same to be correctly stated in the writing. He may also testify from a writing, though he retain no recollection as to the facts, but such evidence must be received with caution. . . .

■ "An examination of the record discloses that the witness here did make the notations himself and he testified that he made copies of these notations. He was not asked directly either on direct or cross-examination whether he copied them correctly, but when a witness testifies under oath that he made a copy it is going far afield to say that such testimony is not equivalent to saying that he copied the memoranda correctly since it would not be a copy unless it was correct. While it is better, of course, to properly and fully qualify the witness who is to testify from or with the aid of memoranda, nevertheless we do not think that what happened here would justify reversal if, indeed, error at all was committed. ■ As to his reading the memoranda into the record, that is permitted when the code says: 'So, also, a witness may testify from such a writing, though he retain no recollection of the particular facts.' ■ Where proper foundation has been laid the fact that the writing does not refresh the recollection of the witness does not prevent him from testifying from the

writing and if his recollection is not refreshed there would be no other way to testify 'from the writing' save to read from it verbatim.''

The record does not indicate where the following plaintiffs reside: C. H. Terry, Oma Terry, H. E. Fletcher, Dorothy Fletcher, William T. Harrison, and Grace Harrison. The judgment as to them must therefore be reversed. The judgment must also be reversed as to plaintiffs Frank Baba and Zale Wooters, who testified that they had not authorized institution of this action in their names.

Of the 56 plaintiffs, only six testified at the trial. The court denied defendants' motion to nonsuit the plaintiffs who did not testify. The conditions described by the plaintiffs' witnesses were common to all plaintiffs who lived in the immediate vicinity of the airport. The testimony was received in behalf of all the plaintiffs. The six who testified were the plaintiffs' witnesses and the fact that these witnesses were themselves plaintiffs did not limit the benefit of their testimony to themselves alone. The conditions they were describing were to some extent common to all the plaintiffs since it described conditions such as low flying, stunting, indulging in acrobatics and the like which would affect those residents in the immediate vicinity of the airport and there was testimony that placed the other plaintiffs within that radius.

In addition to the injunction abating operation of the airport, the trial court awarded the Harlans, the Arvid Andersons, and the Vern Andersons damages of $500 per couple for the annoyance and discomfort caused by defendants' operations before the institution of the action. Defendants contend that these damages are unsupported by the evidence. The testimony of the Harlans and Andersons, which is set out in detail below, is clearly sufficient to support the awards in their favor. (See *Judson* v. *Los Angeles Suburban Gas Co.*, 157 Cal. 168, 172 [106 P. 581, 21 Ann.Cas. 1247, 26 L.R.A.N.S. 183]; *Alonso* v. *Hills,* 95 Cal.App.2d 778, 787-788 [214 P.2d 50].)

The trial court awarded these three couples $500 each for past injuries, but found that all the plaintiffs had suffered irreparable injury and were entitled to injunctive relief. Even though the decree must be reversed as to some plaintiffs, the findings are not necessarily inconsistent. The plaintiffs receiving money damages were the only plaintiffs to give testimony. The annoyance and disturbance caused by

low flying airplanes is very difficult to measure. The other plaintiffs could be injured by the airplanes sufficiently to justify equitable relief, even though their damages could not be measured. By definition, an injunction is properly granted where "it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief." (Civ. Code, § 3422.) ▇▇▇ The term "irreparable injury" authorizing the interposition of a court of equity by way of injunction means that species of damages, whether great or small, that ought not to be submitted to on the one hand or inflicted on the other. (*Edelman Bros.* v. *Baikoff*, 277 Ill.App. 432. See, also, *Greenfield* v. *Board of City Planning Commrs.*, 6 Cal.App.2d 515, 518 [45 P.2d 219]; *Espenscheid* v. *Bauer*, 235 Ill. 172 [85 N.E. 230, 232].)

"The final contention made by the appellants is that the court erred in restraining defendants from operating an airport on the premises described in the complaint. This contention presents a difficult problem and to its discussion a fuller statement of facts than has heretofore been made is desirable. The defendant Souza owned 42 acres of land within one mile of the limits of Turlock. In 1946 he discussed with federal authorities the suitability of this land as an airport site. Encouraged by what he was told, he proceeded to lay out a landing strip and by locating a strip diagonally was able to achieve an airstrip 2,000 feet in length, just 200 feet beyond the minimum permitted by the United States Civil Aeronautics Administration. He constructed a strip 300 feet wide, oiling and smoothing the surface of the ground. Along the southerly line of his property and at the southerly end of the strip was a public road. The property bounding his property on the north was owned by the Andersons, their son and his wife, and the Harlans. A great deal of testimony concerning the location of the homes of these respondents and the location thereof with regard to the airport was given, along with the use of a map. . . . One of the Anderson couples does not reside near the airport, but owns an interest in the property of the other Anderson couple. The Anderson home is about 500 feet from the northern boundary of the strip and about 250 feet from the center line of the strip as extended. The Harlan house is about 500 feet from the northern end of the strip and about 300 feet distant from the same center line. North of the Anderson and Harlan properties and 660 feet from the north line of the airfield there is another public road. The public roads mentioned parallel the north

and south boundaries of the airfield. Some of the plaintiffs reside northerly of this northernmost road. Bounding a part of the Souza property on the west there is another public road across which lie the residences and property of some of the other respondents. Others bound the field on the east. On the southerly road defendants had signs directed to vehicular traffic on the road reading as follows: One sign read, 'Stop, Aircraft Crossing.' There were two of these stop signs, apparently placed to warn vehicular traffic going in either direction upon the road. Between them was a sign reading, 'No Parking Between Signs—Look Out for Low-Flying Aircraft.' A sign directed to aircraft in this same vicinity read, 'All Aircraft Keep 20 to 30 Feet Above the Road.' There is considerable evidence that these warnings were appropriate and that aircraft, in fact, flew over this road onto the airstrip at elevations even below the 20 to 30 feet which the sign requested. The airstrip runs approximately north and south; the generally-prevailing wind is from the north and hence most craft take off in that direction and on the other hand, and for the same reason, generally land from the south. As a part of his construction of the airport Souza invested altogether in land and buildings some $80,000. The value of the homes and residences of the respondents was not the subject of testimony. Although no considerable complaint seems to have been made while the airport was being constructed, the opposition and complaints began very shortly after the field was put in operation. The homes of the respondents were there before the airport was constructed. A flight pattern was laid out, after consultation with the federal authorities, which may be briefly described as follows: A plane taking off into a north wind would rise from the strip and fly over the property beyond its limits until it reached an elevation of approximately 500 feet, at which time it would turn to the west at a right angle, then turn at a right angle south, again turn at a right angle east and then make a landing on the airstrip from the south. The pattern was approximately rectangular. A similar pattern would be followed when a south wind was blowing and the planes took off toward the south, this pattern being the reverse of the one just described. Planes desiring to leave the pattern would make the first right angle turn and then proceed away from the pattern as desired. Incoming planes would fly into the pattern and follow it to a landing. There apparently was no restriction as to the size or type of aircraft permitted to use the field

and although the airfield was privately owned, nevertheless, it was available to the flying public. At frequent intervals planes belonging to business enterprises would arrive and depart from the field in pursuit of their private concerns. Souza testified that there were approximately 18 to 20 planes hangared or tied down at the field as a fair average. The testimony as to the frequency of flight ran all the way from 150 flights per day down to 40 or 50. Most of this flying was during the daytime, beginning around 6 o'clock in the morning and continuing into the evening, but there were apparently no time limitations and planes would arrive and depart during the night, makeshift landing lights being provided. It appears that a light plane taking off to the north would become airborne well before reaching the end of the runway. A heavier plane would make a longer run and would sometimes pass between the Harlan and Anderson homes with little altitude. Supportive of the court's findings that a nuisance existed, in addition to what we have already referred to, we select the following testimony which, although contradicted to some extent by witnesses for appellants, yet must here be taken to be true. Mrs. Neva Harlan testified that 45 or 50 planes used the field daily, many of them flying low over her home; that she was unable to rest during the day because of the disturbance; that the noise was so loud she could not understand normal conversation or hear the radio or use the telephone when the planes went over; that night flying awakened her; that the planes kept the family awake and so upset they could not get back to sleep after being awakened; that the children were awakened early in the morning; that when friends visited the noise drowned out conversation. Arvid Anderson, who resided away from the airfield, but owned an interest in his son's property bordering the field on the north, was accustomed to work about the 10-acre farm, of which it consisted. He testified that as he worked the planes sometimes made him so jumpy he had to leave; that he had to be on the constant lookout because they came in so low that it was really dangerous; that once while running a tractor a plane came in so low that he rolled off the tractor because he was sure it was going to strike him; that once a plane zoomed over him so low that he put his pitchfork up and felt sure the fork would hit the plane; that he had noticed planes crossing from the airfield over his property at heights of 10, 15 or 20 feet; that some of the lighter planes went higher, but he had seen the larger planes skim the top of

the 6-foot fence posts along his southern boundary; that while he had wanted to put a home for himself on the place he could not do it and could not use the place for poultry or turkeys because of the low flying; he was afraid to live on the place. Irene Anderson, who lived in the Anderson home, testified that she had made a count of the planes flying over on certain dates; that on May 15, 1948, just before the case was tried, 110 came over, on May 16th, 105, on Saturday, May 22d, 101, on Sunday, May 23d, 140; that during weekdays there would be 50 a day; that flights generally began at 6 o'clock and continued until dark; that the planes greatly affected her enjoyment of her home and family life, made her nervous, gave her digestive upsets, scared the children. She said 'We are just helpless, we don't have a home, we are without anything, nothing to fight for; we are just helpless where we are; it has just been Hell'; that she could not enjoy radio programs because of the continual noise; that she couldn't use the telephone, nor enjoy the visits of guests or relatives. She said 'When they come there to see us it is Zoom! Zoom! Zoom! just like that, all the time'; that she was awakened early in the morning and when awakened at night could not get to sleep again; that she had no rest and had no peace at all; that the children were scared many times until they were hysterical and would run into the house screaming and crying; that her whole home was upset; that when the airport started operating she was well. She said 'The noise from the airplanes, when I hear them from the beginning, when they start coming off the runway and into the field, they start the motors up, I hear them, they come closer and closer to the house and I see them and my stomach goes—I don't know, it just goes upside down sometimes, and sometimes I vomit. My stomach feels like the insides are just turned upside down—my health is—what are we going to do?' There was considerable testimony along the same general lines. This record supports the conclusion of the trial court that the operation of the field and the flying of the planes as usually and normally occurring constituted a private nuisance and that in view of the increasing use of the field this nuisance would continue and be aggravated. Both Souza and Earlandson testified that they had continually done all they could to prevent improper flying and it is a fair inference that they either cannot or will not abate the nuisance themselves. This is significant in view of the fact

838

that the action had been filed on August 7, 1947, and the case was tried beginning May 18, 1948.

"An airport is not a nuisance *per se,* but that it may become a nuisance either because of unsuitable location or improper operation or both has been clearly decided. (*Thrasher* v. *City of Atlanta,* 178 Ga. 514 [173 S.E. 817, 99 A.L.R. 158]; 2 C.J.S. (Aerial Navigation), § 29, p. 909.) Our Legislature in 1947 passed a State Aeronautics Commission Act. It therein declared that, 'Flight in aircraft over the lands and waters of this State is lawful, unless at altitudes below those prescribed by federal authority, or unless so conducted as to be imminently dangerous to persons or property lawfully on the land or water beneath.' (State Aeronautics Com. Act, § 2(d), ch. 1379, Stats. 1947, 1 Deering's Gen. Laws, Act 151a.) While this act had not gone into effect when the action before us was begun it went into effect approximately one month thereafter and since the injunctive processes of the court are prospective in operation it was applicable to this feature of the case. The licensing and regulation of airports, subject to federal control, is committed by the act to the State Aeronautics Commission. Nevertheless the licensing of the airport by the commission does not confer the right to so operate the port as to constitute a private nuisance to surrounding property owners.

" '. . . A license granted by a state aeronautics commission for the operation of an airport does not confer upon the proprietor thereof the right to operate it in such a manner as to constitute it a private nuisance.' (2 C.J.S. (Aerial Navigation) § 29, p. 909.)

"While apparently no formal license had up to the time of trial been granted to this airport, nevertheless since it was operative prior to June 30, 1947, it comes under the so-called 'grandfather clause' of the State Aeronautics Commission Act, Section 17, which provides that 'Airport site approvals shall be granted and airport permits shall be issued for any improved airports in use or ready for use on June 30, 1947.' We shall treat the airport as a licensed or permitted airport.

"Further, as to the effect of regulations concerning flying operations, it has been held that such regulations do not determine the rights of the surface owners as to nuisance. (*Swetland* v. *Curtiss Airports Corp.,* [C.C.A. Ohio] 55 F.2d 201, 203 [83 A.L.R. 319]), a ruling which is in line with the general principle above stated that permits and licenses are not to be considered as granting leave to maintain

a private nuisance. It is not controlling that the federal government has declared that the United States of America possesses and exercises complete and exclusive national sovereignty in the air space above the United States (U.S.C.A., title 49, § 176a) and that our Legislature has said 'It is further declared that sovereignty in the space above the lands and waters of this State is declared to rest in the State, except where granted to and assumed by the United States pursuant to a constitutional grant from the people of the State' (State Aeronautics Com. Act, § 2(b)), for it must be said that these declarations were not intended to and do not divest owners of the surface of the soil of their lawful rights incident to ownership.

" 'There is no definite yardstick that may be used in determining how low an airplane may fly over the property of others in landing or taking off; however, flying at low altitudes incident to landing and taking off may constitute trespass, as it may cause more than mere apprehension of injury. And, extensive low flying, causing unreasonable annoyance to occupants of land below, is a substantial interference with enjoyment of the property.' (*Brandes* v. *Mitterling*, 67 Ariz. 349 [196 P.2d 464].)

"The regulatory provisions of the State Aeronautics Commission Act and the federal laws referred to do not supplant the ancient common law and long-established statute law declaring that nuisances may be abated at the suit of those injured thereby. Restatement of the Law of Torts, section 194, provides:

" 'An entry above the surface of the earth, in the air space in the possession of another, by a person who is traveling in an aircraft, is privileged if the flight is conducted

" '(a) for the purpose of travel through the air space or for any other legitimate purpose,

" '(b) in a reasonable manner,

" '(c) at such a height as not to interfere unreasonably with the possessor's enjoyment of the surface of the earth and the air space above it, and

" '(d) in conformity with such regulations of the State and federal aeronautical authorities as are in force in the particular State.'

"But:

" 'Under the rule stated in this Section, only those flights are privileged which are conducted at such a height as not

unreasonably to interfere with the possessory interest in the land. Thus, a flight, although otherwise conducted in a reasonable manner, for a legitimate purpose, and in conformity with all applicable local regulations, if conducted at such a low height as to cause reasonable fear or substantial annoyance to occupants of the land or to frighten cattle or other animals thereon in such a way as to cause them harm, or to endanger the surface of the land, or persons, trees, structures or other things thereon, or to interfere with the possessor's legitimate use of the air space, is not within the privilege.' (Comment on clause (c) of § 194.)

''As illustrative of the general trend of judicial decisions upon the subject hereof see the following: *Thrasher* v. *City of Atlanta, supra* (judgment reversed with directions to issue injunction against continued spreading of dust in excessive or unreasonable quantities over adjoining residential property; *Burnham* v. *Beverly Airways, Inc.,* 311 Mass. 628 [42 N.E.2d 575] (decree affirmed, upholding injunction against flying below height of 500 feet over residence 2,800 feet from city-controlled, but privately-operated, airport); *Mohican & Reena, Inc.* v. *Tobiasz,* 1938 U.S.Av.Rep. 1 (injunction granted at suit of owner of summer camp for children against flying below 1,000 feet within 500 feet of camp); *Vanderslice* v. *Shawn,* 26 Del.Ch. 225 [27 A.2d 87] (residents entitled to an injunction against owners of private airport from permitting flights at less that 100 feet of adjacent dwellings); Alhambra Airport case, 13 J. of Air L. & Com. 138 (injunction at suit of taxpayers and board of education prohibiting further use of private airport for pilot training and limiting future use to emergency landings and actual business needs of two aircraft manufacturing plants located at airport); *Dlugos* v. *United Air Lines,* 1944 U.S.Av.Rep. (Ct. Com. Pl. Pa. Lehigh Co., 1944) airline enjoined from operating planes at altitudes below 100 feet over plaintiff's fields adjacent to municipal airport, on days when plaintiff engaged in farming such fields, not to exceed 10 days during following year, provided five hours' written notice given airline at its office); *Swetland* v. *Curtis Airports Corp., supra* (airport completely abated by circuit court, notwithstanding refusal of trial court to do so.)

''A further contention is made that the trial court still was not authorized to enjoin the further operation of the airport and necessarily must have limited its injunctive order to prevention of the nuisance existing; that this could be done without forbidding all operation of the airport. ██ In-

junctive process ought never to go beyond the necessities of the case and where a legitimate business is being conducted and in the conduct thereof a nuisance has been created and is being maintained, the relief granted should be directed and confined to the elimination of the nuisance, unless under the peculiar circumstances of the case the business, lawful in itself, cannot be conducted without creating a nuisance and violating the rights of contiguous property owners. In *Vowinckel* v. *N. Clark & Sons*, 216 Cal. 156, 162 [13 P.2d 733], in a case involving a decree ordering defendant to cease operating a number of pottery kilns, the court said:

" 'In the present case the court appears to have given due consideration to the situation of the defendant. This is apparent from the fact that it refused to abate entirely the defendant's operations and granted the relief sought to the extent necessary to preserve the rights of both parties. In other words the court, in the exercise of its equity powers, has compared consequences and has considered the injuries resulting to each party, on the one hand if the injunction be wholly denied, and on the other if it be granted. The court, from the evidence presented, gave heed to the rule that in a proper case it will not enjoin the conduct of the defendant's entire business, where such business is not a nuisance per se, if a less measure of restriction will afford to the plaintiff the relief to which he may be entitled. (*McMenomy* v. *Baud*, 87 Cal. 134 [26 P. 795]; *Tuebner* v. *California St. R. Co.*, 66 Cal. 171 [4 P. 1162]; *Williams* v. *Blue Bird Laundry Co.*, supra [85 Cal.App. 388 (259 P. 484)]; *McIntosh* v. *Brimmer*, supra [68 Cal.App. 770 (230 P. 203)].)'

"In this case it is apparent from the memorandum opinion written by the able trial judge, on motion for new trial, that it was his conclusion nothing short of complete abatement would preserve the rights of respondents and he attributed this principally to the shortness of the runway. The learned trial judge said:

" 'The third contention, that the injunction was too broad, is a more difficult question. Ordinarily it is true that a lawful act should not be enjoined; that all that should be enjoined is the commission of the act in such a way as to constitute a nuisance; in other words, that only the nuisance should be enjoined. Under that interpretation, defendants ask to be allowed to continue operations provided they commit no nuisance. But in the Court's opinion, that is impossible. The

continued operation of that field in its present condition, according to the evidence, must inevitably result in continuance of the nuisance. The field is entirely too small to avoid the nuisance; and the runway is too close to the homes of some of the plaintiffs.'

■ "Pertinent to the problem now being discussed is the nature of the airfield involved. It is a private airfield which cannot exercise the power of condemnation and the establishment of which requires no finding by any public agency of public convenience and necessity. ■ The owners and operators of such an airport, notwithstanding they are engaged in a legitimate business, the encouragement and furtherance of which is a publicly-declared policy of our Legislature (State Aeronautics Com. Act, § 2(a)) [see, also, Deering's Gen. Laws, Acts 153c and 153e] must nevertheless conduct it with due regard for the rights of others, and if because of location the operation of such a business will result in depriving others of their property rights, it cannot be permitted, for to do so would, in practical effect, condemn the property of others in violation of constitutional guarantees. (*Hulbert* v. *California Portland Cement Co.,* 161 Cal. 239 [118 P. 928, 38 L.R.A.N.S. 436].)

"The distinction between a public and private use as regards the use of injunctive process is pointed out in *New York City* v. *Pine,* 185 U.S. 93 [22 S.Ct. 592, 46 L.Ed. 820], wherein the Supreme Court of the United States recognized the principle that, where the defendant in an injunction suit has the ultimate right, that is to say, where it is entitled to continue with its work by eminent domain proceedings, a permanent injunction will be denied, but a temporary injunction may be granted to compel the defendant to make compensation. The State Aeronautics Commission Act contemplates the furtherance of aviation, with its manifold benefits to the public, by operation of both public and private fields, but with respect to the public fields it provides for their establishment by counties, cities and other municipal agencies, requires the finding of public convenience and necessity and contemplates the use of the power of condemnation. No such power is given or could be given to those putting their property to private use, even though incidentally the general purposes of the act are thereby subserved. ■ We conclude there is nothing to distinguish a private airport from any other private business with regard to enjoining operations which create a nuisance.

"However, we are still confronted with the final question of whether or not the record here and the findings of the trial court itself support the issuance of the decree completely forbidding the continued use of the property involved as an airfield.

"The allegations in the complaint which have been heretofore stated indicate clearly that it is the way in which the flying has been done that constitutes the nuisance complained of. Considering these allegations, the following things ·must be said: That buzzing, stunting and engaging in acrobatics can be prohibited without difficulty. The allegations that planes taxi, take off, circle, cruise about, maneuver, glide, climb, bank and turn are descriptions of ordinary and necessary actions in flying a plane, not objectionable unless conducted in such close proximity to plaintiffs' homes as to constitute a nuisance. It is the way they are being done and not the doing of them in and of itself which is the cause for complaint. It is the doing of these things at such low altitudes and in such close proximity to plaintiffs' homes and property that is the gravamen of the cause. Limits could be placed upon the doing of these acts which would eliminate the nuisance. ▮ Plaintiffs also plead that 'the only available remedy to Plaintiffs, . . . is a permanent injunction restraining the Defendants permanently from operating the said airport as an airport,' but this is said to be necessary 'because of the peculiar acts of the Defendants.' While all these allegations were found to be true by the trial court we think that neither the pleadings nor the findings justify the complete abatement of the enterprise; and that the testimony does not support the extreme decree granted.''

▮ Defendants maintained throughout the case that their ordinary operations did not constitute a nuisance and therefore offered no evidence or suggestions as to how the airport could be operated without constituting a nuisance. Although they were in error in concluding that their operations did not constitute a nuisance, the burden was on plaintiffs who sought to close the airport to prove that no planes could fly to and from the field at proper elevations.

"No witness testified planes could not fly to and from the field and still fly at such elevations as would eliminate the nuisance factor which now exists. ▮ Contiguous property owners must to a reasonable degree yield their desired privacy to the general welfare which is contributed to by the operation of legitimate businesses. Were it not so, railroads

could not operate near residences, and factories could not be established without the necessity of purchasing prohibitively large areas of property. That reasonable inconvenience must be suffered by owners whose holdings are contiguous to commercial enterprises is too well decided to require citation of authorities. The evidence shows that the length of the runway here, while approximating the lowest limit fixed by federal authority, yet does exceed that limit. ■ We are aware that airplanes necessarily ascend and descend on rising and descending planes and that where a runway is too short to permit them to ascend or descend over contiguous property without invading the lawful right of the surface owner to the air above his holdings their flight would constitute an unlawful act. Nevertheless there is no testimony here that the runway is so short that no planes could lawfully operate from the field. That such was the situation in the opinion of the learned trial judge appears from that part of his written opinion which we have quoted, but the evidence does not sustain that position. We think, therefore, that upon this record here, considering the evidence, the pleadings and the findings, the decree rendered went beyond permissible limits. ■ It may be that the imposition of appropriate limitations will, by reason of the shortness of the runway, and the prevailing flying conditions, make it impossible for the airfield to be operated in a normal and usual manner, but that has not been shown; and until it is the injunction forbidding all operations from the field cannot be sustained. It may be difficult, but we think it is not impossible for the trial court either upon the evidence now in the record, or to be taken, to frame a decree which will eliminate the nuisance that has been shown to exist. . . .'' For example, flight over the homes of plaintiffs at elevations below those set by federal authority could be forbidden; flight by flyers unable to comply with such a regulation by reason of inexperience could be forbidden; use of the airport by any type or size of aircraft for which the court on competent evidence finds the airport inadequate, could be forbidden; flight except during daylight hours could be forbidden if necessary; if defendants cannot comply with such restrictions all operations from the field could be forbidden. Complete abatement of the enterprise is undoubtedly the result plaintiffs desire, but, in the absence of a showing that the airport and flying school could not be operated in such a way as not to constitute a nuisance, complete abatement is beyond the rights of plaintiffs.

The advance of aeronautical science may make use of the field possible without injury to plaintiffs, by aircraft that can operate without making unduly low and noisy flights. Defendants may acquire additional land and extend their runway. Upon a proper showing of changed circumstances, the trial court may modify or dissolve the injunction. (*Sontag Chain Stores Co.* v. *Superior Court*, 18 Cal.2d 92 [113 P.2d 689] ; see cases collected in 28 Am.Jur. 485-495.)

The judgment for damages is affirmed. The judgment is reversed as to plaintiffs C. H. Terry, Oma Terry, H. E. Fletcher, Dorothy Fletcher, William T. Harrison, Grace Harrison, Frank Baba, and Zale Wooters. That part of the judgment enjoining and restraining the defendants from operating the airport on the premises is reversed and the cause is remanded to the trial court for further proceedings in harmony with the views expressed in this opinion. Costs are awarded to plaintiffs.

SCHAUER, J.—Concurring and Dissenting.

I concur in the reversal of the judgment as to plaintiffs Terry, Fletcher, Harrison, Baba and Wooters, and in the reversal of the part of the judgment which restrains defendants from operating the airport. I agree that the cause should be remanded for further proceedings in accord with the view that "Contiguous property owners must to a reasonable degree yield their desired privacy to the general welfare which is contributed to by the operation of legitimate businesses. Were it not so, railroads could not operate near residences, and factories could not be established without the necessity of purchasing prohibitively large areas of property. That reasonable inconvenience must be suffered by owners whose holdings are contiguous to commercial enterprises is too well decided to require citation of authorities."

An airport is just as lawful, just as much in the public interest and as necessary for its convenience, as a garage or a service station, and a school of aeronautics is just as lawful and serves the public interest as truly as any other school which teaches a useful art or science or craft. Such activities may constitute "a substantial interference with enjoyment of the property" which is in proximity to the places where they are carried on, but it is only an interference which is unreasonable under all the circumstances that can be enjoined. (See, e.g., *Nagel* v. *Dorrington* (1927), 202 Cal. 698, 700 [262 P. 718], refusing to enjoin operation of garage and

service station in the absence of a showing that "it is operated in some extraordinary manner so as to be a nuisance because of such operation.")

I dissent from the affirmance of the judgment for damages against Souza, owner of the airstrip, and his wife. In my opinion the evidence does not support the findings that the Souzas operated the airport and that Souza operated "many" planes from it. Souza testified that he did not operate the airport; that he had leased it to Earlandson, who, under the terms of the lease, had the exclusive right to operate it. Mr. Souza collected rent from Earlandson and from the owners of some 18 planes which were kept at the field. There is no evidence that Souza controlled the operation of these planes which regularly occupied space at the airport or that these particular planes were operated in a manner which was legitimately objectionable to any plaintiff. Souza did not lease the land for any improper purpose; he leased it for the lawful, useful purposes of the operation of a flying school, the storing of planes, and the servicing of planes which used the field. Souza did not operate "many" planes; he owned and operated only one plane and there is no evidence that he himself ever used his airport or his airplane unlawfully or in such a manner as to interfere with any plaintiff's use and enjoyment of plaintiffs' land.

Would it be reasonable to hold that the owner of property used as a garage, for the storing and repair of automobiles, is to be liable for damages and for abatement of the use of his property if owners of the automobiles stored or serviced at his garage drive them on the highways in such a manner as to violate the law and constitute a nuisance? If the owner of garage property is not to be held to such an extended degree of responsibility for the independent acts of his patrons then neither should the owner of an airport. The liability here of Mr. and Mrs. Souza rests on no better foundation.

It is relatively but a few years since courts—and, of course, the citizenry at large who brought the cases to court—were struggling with a new concept: the use of public highways by self-propelled vehicles. Illustrative of the difficulties encountered then is *Nason* v. *West* (1900), 31 Misc. 583 [65 N.Y.S. 651, 652-653], an action for damages which resulted when plaintiffs' horse was frightened by defendant's carefully driven motor carriage. The court said: "It will not do to say that it is proper to run any kind of a contrivance upon the street, in which persons may be carried. A machine that

would go puffing and snorting through the streets, trailing clouds of steam and smoke, might be a nuisance; but this is not such a case. It cannot be said that the defendant's machine is such a departure in its construction or mode of operation from other steam motor carriages, which experience has lately shown to be entirely practicable for street use, as to make it a nuisance, although, because of the present novelty of horseless carriages, horses may take fright at its approach." Judgment for the plaintiffs was reversed.

The thought that privately owned automobiles might be generally barred from public highways is now archaic. So also is the thought that privately owned surface vessels might be generally barred from the use of navigable waters. But there are still many people who have not yet accepted the concept that the navigable sea of the air is a public domain and that "Flight in aircraft over the lands and waters of this state is lawful, unless at altitudes below those prescribed by federal authority, or unless so conducted as to be imminently dangerous to persons or property lawfully on the land or water beneath." (State Aeronautics Com. Act, § 2(b), ch. 1379, Stats. 1947, 1 Deering's Gen. Laws, Act 151a.) Only a couple of decades ago pilots often heard the statement (which almost became an adage) that "One doesn't have to be crazy to fly but it helps." There are people who still believe this. But the magnificent records of safe, speedy and comfortable transportation through the use of airplanes, made by both airline companies and conservative private owners, have disproved the "adage."

The published records of the Civil Aeronautics Authority disclose that (as of February 1, 1952) there were 88,275 civil aircraft registered in the United States, of which 1,258 were scheduled air carrier aircraft and 87,017 were privately owned and operated in other than scheduled air carrier operations. Every one of these 88,275 airplanes must have airports from and to which to operate; the utility of each can be no greater than the available take off and landing facilities. By reason of size, weight and other limitations, the 1,258 scheduled air carrier aircraft are limited to the use of relatively very large and highly improved airports but the great majority of the 87,017 privately owned and operated airplanes are built to take off and land on much smaller fields. The loss of any approved and established airport—small or large—is a loss to the people of the entire state. As declared in "California

Airport Study" (1950), prepared by the California Aeronautics Commission, "Aviation's part in California's growth is large. The State has accepted the aircraft as an important means of transportation, and as a new tool of agriculture. Airports must be provided on a permanent and equitable basis. Detailed study of the inventory of the State's airports and careful consideration of the specific needs of the various counties and cities, individually and collectively, leads to certain broad conclusions. These are:

"An airport is a part of a state-wide transportation system and serves all of the people of the State—not just those who live in the immediate vicinity of the terminal.

"The 'highway system of the air' will not give full service nor show adequate returns until it is completed.

"To keep California abreast of national progress a definite, integrated, program must be instituted to establish the system.

"The problem confronting the people of the State of California at the present time is the establishment of a SYSTEM of airports on a permanent basis in order to realize the full benefit to be derived from aviation.

"The terrain will force the use of the airplane for rapid and economic travel in many areas. The distances between the State's major areas of population will demand transportation means faster than can be accomplished on the surface.

"Many airports are needed to adequately serve populated areas.

"Airports are needed to give access to the many fine existing recreational areas, and to develop others that are not otherwise accessible.

"Isolated airports are required to complete the system.

"Some airports are needed to save lives."

Returning more particularly to the law applicable to this case I would emphasize that neither noise alone (see *Smith* v. *New England Aircraft Co.* (1930), 270 Mass. 511 [170 N.E. 385, 69 A.L.R. 300, 306]; *Delta Air Corp.* v. *Kersey* (1942), 193 Ga. 862 [20 S.E.2d 245, 140 A.L.R. 1352, 1356]; *Crew* v. *Gallagher* (1948), 358 Pa. 541, 548 [58 A.2d 179]), nor mere apprehension of danger of falling airplanes (see *Thrasher* v. *Atlanta* (1934), 178 Ga. 514 [173 S.E. 817, 99 A.L.R. 158, 163]; *Batcheller* v. *Commonwealth* (1940), 176 Va. 109, 117 [10 S.E.2d 529])—the two elements of which particular complaint is made in the testimony of those plaintiffs who took the stand in support of the allegations of the

complaint— are sufficient grounds for enjoining the operation of an airport.

In the state of the evidence here I would hold that the Souzas are within the rule of such cases as *Meloy* v. *City of Santa Monica* (1932), 124 Cal.App. 622, 627 [12 P.2d 1072], and *Mundt* v. *Nowlin* (1941), 44 Cal.App.2d 414, 416 [112 P.2d 782], that a landlord is not liable for a nuisance created by lessees who have leased the land for lawful and proper purposes. It was not shown that a nuisance is a necessary consequence of the operation of the flying school and airport here. The lessor should not be liable for their operation in a manner which he did not contemplate and to which he did not consent.

Earlandson states that he has no objection to any unlawful or improper actions being enjoined. Earlandson is liable only for unlawful use of the airport which he could control. Since there is evidence tending to show that planes of Earlandson's flying school, inferentially controlled by him, often passed over the land of plaintiffs at unnecessarily low altitudes when taking off, the finding against Earlandson on this point can be upheld, but the relief adjudged against him should go no further than the ends of equity, upon the proof, may require.

CARTER, J.—I dissent.

I agree with everything in the majority opinion of this court *except* its conclusion that a permanent injunction should not have been granted. The trial judge who heard the evidence, saw the witnesses, and viewed the maps and photographs, was of the opinion that the airfield could not be so operated that it would not constitute a continuing nuisance as to plaintiffs.

Inherent in the majority opinion is the premise that plaintiffs had clearly shown that a nuisance existed as it undoubtedly did and will continue to exist. The trial court was of the opinion that the continued operation of the field "in *its* present condition, according to the evidence, (note that it was not *only* the manner in which the planes were operated) must *inevitably* result in continuance of the nuisance. *The field is entirely too small* to avoid the nuisance; and the runway is too close to the homes of some of the plaintiffs." (Italics added.) Having heard the evidence, the trial judge was in a position to know that a permanent in-

junction was necessary to preserve the rights of these plaintiffs. A majority of this court, however, feels that this is much too drastic a step and reverses that portion of the judgment.

The landing strip on the airfield is laid out *diagonally*. The airstrip is 2,000 feet in length, just 200 feet beyond the minimum permitted by the United States Civil Aeronautics Administration. The majority states that there is no testimony to show that the runway is so short that planes could not lawfully operate from the field. Apparently the testimony was all to the effect that no planes *did* lawfully operate from the field and it is stated by a majority of this court that although defendants testified ''that they had continually done all they could to prevent improper flying . . . it is a fair inference that they either *cannot* or will not abate the nuisance themselves. This is significant in view of the fact that the action had been filed on August 7, 1947, and the case was tried beginning May 18, 1948.'' (Italics added.) It is conceded that a nuisance existed; that the plaintiffs proved their case, but the judgment granting a permanent injunction is reversed. The reason assigned for this conclusion is that plaintiffs have not shown that it is impossible for the airfield to be ''operated in a normal and usual manner.'' If this is stated in another way, it means that plaintiffs are required to prove what defendants *should* be required to prove: *That the airport can be so operated as not to create a nuisance.* The injunction having been granted, it appears to me that it is now up to the defendants to prove that they are prepared to so operate their admittedly lawful business as to comply with the regulations this court has decided will constitute a lawful operation thereof. For example, ''flight over the homes of plaintiffs at elevations below those set by federal authority *could* be forbidden; flight by flyers unable to comply with such a regulation by reason of inexperience *could* be forbidden; use of the airport by any type or size of aircraft for which the court on competent evidence finds the airport inadequate, *could* be forbidden; flight except during daylight hours *could* be forbidden if necessary''; and ''the advance of aeronautical science *may* make use of the field possible without injury to plaintiffs . . . defendants *may* acquire additional land and extend their runway.'' *And,* as a complete answer, it is stated that *''upon a proper showing of changed circumstances,* the trial court *may modify or dissolve* the injunction''—this undoubtedly refers to the ''further

proceedings in harmony with the views expressed in the (majority) opinion." (Italics added.)

It appears to me that under the "views expressed," plaintiffs now must show defendants how to try to lawfully operate their airfield. Then, if the nuisance continues to exist, they must again go to court, prove the existence of the nuisance and receive money damages and a permanent injunction which would, in turn, probably be again reversed by a majority of this court. Up until now, it had always been my understanding that a single suit in equity took the place of many successive suits at law for damages with the court of equity ending by injunction the violation of the plaintiff's rights which, together with recovery of damages sustained, settled the entire controversy in a *single* suit. Damages are clearly inadequate here; a permanent injunction is the only thing which will give plaintiffs the relief they seek, and the only thing which will prevent a multiplicity of suits.

It appears to me that the result reached by a majority of this court is in direct conflict with the usual procedure. It is uniformly recognized that where a final or permanent injunction has been granted, the court *which granted it* may dissolve or modify it where changes in circumstances or conditions warrant it (*Santa Rita Oil Co.* v. *State Board of Equalization*, (Mont.) 116 P.2d 1012, 136 A.L.R. 757; *Ladner* v. *Siegel*, 298 Pa. 487 [148 A. 699, 68 A.L.R. 1172]; *Washington Water Power Co.* v. *City of Coeur d'Alene*, (Idaho) 24 F.Supp. 790; *Sontag Chain Stores Co.* v. *Superior Court*, 18 Cal.2d 92 [113 P.2d 689]; *Kelley* v. *Earle*, 325 Pa. 337 [190 A. 140]; *Hodges* v. *Snyder*, 45 S.D. 149 [186 N.W. 867, 25 A.L.R. 1128], 261 U.S. 600 [43 S.Ct. 435, 67 L.Ed. 819]; Equity, de Funiak, § 8, p. 19.)

In the Sontag case (p. 94), this court in discussing a permanent injunction had this to say: "This is so because the decree, although purporting on its face to be permanent, is in essence of an executory or continuing nature, creating no right but merely assuming to protect a right from unlawful and injurious interference. Such a decree, it has uniformly been held, is always subject, upon a proper showing, to modification or dissolution by the court which rendered it. The court's power in this respect is an inherent one." This would appear to be particularly applicable to the instant case. When, and if, the defendants can show that they are able to so operate their airfield as to respect plaintiffs' property rights,

then the court which granted the injunction may modify or dissolve it. This procedure places the burden where it belongs—on the ones who have created, and who continue to create, the nuisance complained of. The numerous ways in which the airport could be operated so as not to interfere with plaintiffs' rights (as pointed out in the majority opinion, and which I have heretofore set forth) would seem to be innovations which defendants could put into practice *before* applying for modification or dissolution of the injunction. In effect, the majority says to plaintiffs: You have proven sufficient facts to show that the manner in which defendants have operated their airport constitutes a nuisance, and you have been damaged thereby, but defendants may be able to change their method of operation so as to eliminate the objectionable features and thereby discontinue the nuisance. Therefore, without any assurance that defendants will do so, we will deprive you of the protection afforded by the injunction and will force you to again apply to the trial court for such protection, and if the trial court grants it, we may again reverse the judgment, in the hope that defendants may, at some time in the future, change their method of operation so as to make their operation lawful. This may continue ad infinitum.

The holding of the majority in this case marks a clear departure from the settled course of procedure, as it places the burden on plaintiffs to press their claim for relief or suffer from the continuance of the nuisance. As I have hereinabove pointed out, if the injunctive provisions of the instant judgment are affirmed, defendants are not thereby prevented from so changing their method of operation as to eliminate the nuisance, if this can be done. At such time they may apply to the court for such relief as they may be entitled to receive. In the meantime, plaintiffs are protected from the continuance of the nuisance and the consequent damage to their property which the injunction was issued to prevent.

For the foregoing reasons, I would affirm the judgment.