Filed 4/2/25

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| BRING BACK THE KERN, et al.,<br><br>Plaintiffs and Respondents,<br><br>v.<br><br>CITY OF BAKERSFIELD,<br><br>Defendant and Respondent;<br><br>NORTH KERN WATER STORAGE DISTRICT et al.,<br><br>Real Parties in Interest and Appellants.<br><br>[And five other cases.]* | F087487<br><br>(Super. Ct. No. BCV-22-103220)<br><br><br>**OPINION** |

APPEAL from orders of the Superior Court of Kern County.  Gregory A. Pulskamp, Judge.

Young Wooldridge, Scott K. Kuney and Brett A. Stroud, for Real Party in Interest and Appellant North Kern Water Storage District.

McMurtrey, Hartsock, Worth & St. Lawrence and Isaac Lee St. Lawrence for Real Party in Interest and Appellant Buena Vista Water Storage District.

---

*\* Bring Back the Kern v. City of Bakersfield* (No. F087503); *Bring Back the Kern v. City of Bakersfield* (No. F087549); *Bring Back the Kern v. City of Bakersfield* (No. F087558); *Bring Back the Kern v. City of Bakersfield* (No. F087560); *Bring Back the Kern v. City of Bakersfield* (No. F087702).

Ellison Schneider Harris & Donlan; Wanger Jones Helsey, Robert Edward Donlan, Craig A. Carnes, Jr., Kevin William Bursey; Richard L. Iger for Real Party in Interest and Appellant Kern Delta Water District.

Belden Blaine Raytis, Daniel N. Raytis, Daniel M. Root; Stoel Rives and Jennifer Lynn Spaletta for Real Party in Interest and Appellant Rosedale-Rio Bravo Water Storage District.

Somach Simmons & Dunn, Nicholas A. Jacobs, Louinda V. Lacey, and Michelle E. Chester, for Real Party in Interest and Appellant Kern County Water Agency.

Hanson Bridgett, Gary A. Watt, Nathan A. Metcalf, Sean G. Herman, and Jillian E. Ames, for Real Party in Interest and Appellant J. G. Boswell Company.

Duane Morris, Colin L. Pearce, Jolie-Anne S. Ansley; Virginia A. Gennaro, City Attorney, and Matthew S. Collom, Deputy City Attorney, for Defendant and Respondent.

Law Office of Adam Keats and Adam F. Keats for Plaintiffs and Respondents Bring Back the Kern, Kern River Parkway Foundation, Kern Audubon Society, Sierra Club, and Center for Biological Diversity.

William Albert McKinnon for Plaintiff and Respondent Water Audit California.

Amanda Cooper and Walter Collins for California Trout, Inc. as Amici Curiae on behalf of Plaintiffs and Respondents Bring Back the Kern, Kern River Parkway Foundation, Kern Audubon Society, Sierra Club, Center for Biological Diversity, and Water Audit California.

Rob Bonta, Attorney General, Tracy L. Winsor, Assistant Attorney General, Eric M. Katz, Tara L. Mueller, and Jeffrey P. Reusch for the California Attorney General and California Department of Fish & Wildlife as Amici Curiae on behalf of Plaintiffs and Respondents Bring Back the Kern, Kern River Parkway Foundation, Kern Audubon Society, Sierra Club, Center for Biological Diversity, and Water Audit California.

-ooOoo-

2.

The City of Bakersfield (City) operates multiple weirs on the Kern River used to divert water for its own use and the use of several other entities, including appellants. Appellants are several water agencies, including the North Kern Water Storage District (NKWSD), the Buena Vista Water Storage District and others. (See Wat. Code, § 12970; Stats. 1961, ch. 1003, pp. 2651-2652.)[1]

Respondents Bring Back the Kern (BBTK), Water Audit California (WAC), the Sierra Club and other environmental groups sought and obtained a preliminary injunction in the trial court.[2] The injunction prohibited Bakersfield from operating the weirs in question "in any manner that reduces Kern River flows below the volume sufficient to keep fish downstream of said weirs in good condition." (See Fish & G. Code, § 5937.)[3] In its ruling, the trial court expressly refused to weigh the potential harm to the City of Bakersfield or the water agencies in determining whether applying section 5937 to the Kern River would result in "an appropriate use of water."

Shortly thereafter, the trial court established a flow rate pursuant to a stipulation offered by City and BBTK, but not agreed to by appellants. After appellants filed motions for reconsideration, the court stayed the flow rate order and modified the injunction.

Appellants appeal the injunction and the order setting a flow rate. We hold that under the self-executing provisions of article X, section 2 of the state Constitution, courts must always consider reasonableness whenever adjudicating a use of water – even if the pertinent statutes do not call for a reasonableness determination themselves. Article 2 is

---

[1] Appellant and intervener J.G. Boswell (Boswell) asserts that it owns Kern River water rights as well as agricultural property it claims could flood under high river flow conditions.

[2] We will generally refer to the environmental plaintiffs collectively as BBTK, except where we refer to Water Audit California specifically as a separately-represented party.

[3] All statutory references are to the Fish and Game Code unless otherwise stated.

"the supreme law of the state, which the courts are bound to enforce, *and it must be made effectual in all cases* and as to all rights not protected by other constitutional guaranties." (*Gin S. Chow v. City of Santa Barbara* (1933) 217 Cal. 673, 700 (*Gin S. Chow*), italics added.)  The court's failure to directly consider the reasonableness of the water use it was ordering in the injunction was constitutional error.

Consequently, we reverse the injunction and the order setting a flow rate, and remand for further proceedings.[4]

## I.      BACKGROUND

The Kern River originates atop Mount Whitney in the Sierra Nevada Mountains. After flowing in a southerly direction, its waters are impounded by Isabella Dam.  From there, it flows approximately 33 river miles down a steep canyon to the eastern edge of Bakersfield.

There is a complex web of claims to the waters of the Kern River.  In order to manage and implement the water rights and contracts governing the Kern River, its flows are measured at two points. The first point of measurement is approximately 10 river miles downstream of the mouth of Kern River Canyon ("First Point").  The second point

---

[4] We also rule on several requests for judicial notice filed in this court.

Bakersfield's request for judicial notice is denied, as the matters to be noticed were either filed after the trial court made the decisions being challenged herein, concern matters immaterial to resolution of the appeal, and/or were not before the trial court when it made the challenged orders.  (See *In re Marriage of LaMoure* (2011) 198 Cal.App.4th 807, 812 fn. 1 (*LaMoure*).)

J.G. Boswell's unopposed motion for judicial notice is granted.  While exhibits 6 and 7 were filed after the challenged orders were made, they are only being relied upon to explain the procedural history of the case.

The request for judicial notice filed by the water agencies on October 28, 2024, is denied.  The matters to be noticed were filed after the orders challenged on appeal.  (See *LaMoure, supra,* 198 Cal.App.4th at p. 812 fn. 1.)

BBTK's unopposed request for judicial notice filed January 30, 2025, is granted.

4.

of measurement is approximately 21 river miles downstream of First Point, just east of Interstate 5 ("Second Point").

*Miller-Haggin Agreement*

"Under the 1888 Miller-Haggin Agreement, water rights were allocated into three groups: First Point rights, Second Point rights, and Lower River rights. Water allocations are based on the computed natural flow at the First Point, and allocations of the First and Second Point flows are made on a daily basis. Any water that is not stored or diverted by the First and Second Point rights holders and which passes State Highway 46 via the Kern Flood Channel belongs to Lower River rights holders. Allocations to Lower River rights holders are typically only available in wet years." (*Buena Vista Water Storage Dist. v. Kern Water Bank Authority* (2022) 76 Cal.App.5th 576, 582, fn. omitted.)

*Shaw Decree*

"As a result of litigation among certain Kern River water users, a declaratory judgment was entered in 1901, known as the Shaw Decree, which formalized the existing common law rights. [Citation.] That decree memorialized each appropriator's right in terms of cubic feet per second, a figure referred to as the appropriator's 'paper entitlement.' In addition, the decree established that at each particular stage of the river (that is, the flow of the river in its natural channel), measured daily at a fixed point, each junior appropriator was entitled to all, some, or none of the water for which it had appropriative rights, a figure referred to as an appropriator's 'theoretical entitlement.' Thus, under the Shaw Decree, an appropriator with, for example, a 100 cubic feet per second (cfs) paper entitlement might have only an 85 cfs theoretical entitlement when the river stage is 512 cfs, but a 100 cfs theoretical entitlement if the river stage is 527 cfs or greater." (*North Kern Water Storage Dist. v. Kern Delta Water Dist.* (2007) 147 Cal.App.4th 555, 561-562 (*North Kern Water*).)

"In addition to paper and theoretical entitlements, an appropriator is entitled to divert water if a senior appropriator does not claim its entire allocation that day. When

5.

an appropriator has not diverted its entire theoretical entitlement on a given day, the excess water is 'released to the river.' In that case, the next most senior appropriator is entitled to divert released water to, in effect, augment the stage or natural flow of the river; the junior appropriator then may divert water for which it has no theoretical entitlement, up to the full paper entitlement of that user. Any release water not claimed by a more senior user becomes available to the next junior user in the same manner until the water supply is exhausted." (*North Kern Water, supra,* 147 Cal.App.4th at p. 562.)

*Kern River Water Rights and Storage Agreement*

On December 31, 1962, various water districts entered into an agreement titled the Kern River Water Rights and Storage Agreement. The agreement distinguished two groups. The first was the "upstream group," which included North Kern and Buena Vista. The second was the "downstream group," which included Tulare Lake Basin Water Storage District and Hacienda Water District. The agreement set forth the percentages of natural flow as measured at the First Point that would be allocated to the downstream group. The agreement also generally obligated North Kern to transport the waters allocated to the downstream group to the Second Point. North Kern and Buena Vista agreed their apportionment would be divided pursuant to the Miller-Haggin Agreement as amended (with limited enumerated exceptions).

*Agreement 76-36*

The City entered into an agreement with Tenneco West, Inc., among others, dated April 12, 1976. Pursuant to the agreement, the City acquired the water rights interests in the Kern River that had belonged to Tenneco West, Inc., Kern Island Water Company, and Kern River Canal and Irrigating Company.

Agreement 76-36 further provided that the City would "assume all public service obligations of Kern Island [Water Company] and [Kern River Canal and Irrigating Company] existing at the time of Closing, including without limitation, the obligations of such companies to furnish water service to the customers of their respective service areas,

6.

and obligations described in Exhibits attached hereto." The Miller-Haggin Agreement and Shaw Decree were both exhibits attached to Agreement 76-36.

*River Flow Variability*

Measurements taken at First Point reflect that the flow of Kern River can vary drastically from year to year. For example, the river's annual flow in 1983 was nearly 2.5 million acre-feet; however, in 2015, it was 139,000 acre-feet.

*Administration of Kern River Flows*

In order to administer this complicated web of water contracts, deliveries and rights – only some of which have been described above – the flows of the river are monitored and reported daily.

*Sample Record of Kern River for August 29, 2023*

For example, on August 29, 2023, it was recorded that the natural flow entering Isabella Reservoir was 1,679 cubic feet per second ("cfs"), and the amount of water then-stored in the reservoir was 489,430 acre-feet. It was further recorded that the U.S. Army Corps of Engineers (USACE) had requested an increase of outflows in the amount of 280 cfs to begin at 7 p.m.

In total, the requested outflows from Isabella on August 29, 2023, were 3,460 cfs – which was the sum of the natural water entering Isabella (i.e., 1,679 cfs) plus requests from water agencies in the amount of 1,781 cfs. It was further estimated that 7 cfs would flow into the river downstream of Isabella.

In order to deliver the water to the appropriate requester, specific amounts of water must be diverted at each weir and canal along the Kern River channel. This amount is set daily at a specific flow rate. For example, on August 29, 2023, a diversion of 560 cfs was to occur at the Bearsley Canal; a diversion of 425 cfs was to occur at the Carrier Headgate, and so on.

*City's Role*

The daily water orders from water agencies and the City are administered by the City of Bakersfield – specifically by the Hydrographic Unit of its Water Resources Department. Each water user informs the City's Hydrographic Unit of its needs, and daily operations are constantly revised pursuant to supply and demand.

*Flows Past the McClung Weir*

The last weir before the Kern River enters Bakersfield is the McClung Weir. For nearly half a century prior to 2023, the Kern River had not been recorded flowing past the McClung Weir on a sustained basis, according to the Deputy General Manager of the North Kern Water Storage District.[5] As a result of major infrastructure improvements increasing diversions of the river's waters, the riverbed downstream of the Calloway Weir is completely dry most of the year, and water only flows during "very wet; high-flow conditions" or when water is introduced from outside sources.

However, after an abnormally large snowpack, the flows of the Kern River did begin to flow past the McClung Weir on a sustained basis on March 15, 2023. This flow continued for several months to August, when BBTK filed the present action.

---

[5] Even then, the year was 1983 – the largest annual flow in 128 years of recorded flows.

8.

*Procedural History*

In a verified complaint and petition for writ of mandate dated November 30, 2022, BBTK sued the City of Bakersfield.[6] The complaint also listed North Kern Water Storage District and the other appellant water agencies as real parties in interest.[7]

The water agencies filed a demurrer. In March 2023, plaintiffs filed an amended complaint, which omitted the water agencies as named parties. Bakersfield filed a demurrer to the amended complaint on several grounds, including that the amended complaint failed to join the water agencies, which were necessary and indispensable parties. The water agencies moved to intervene in the case on May 2, 2023.

The court sustained Bakersfield's demurrer on the ground that it failed to include the water agencies as necessary parties. The court also ruled that while it was inclined to grant the water agencies' motion to intervene, that the motion was now moot in light of the sustaining of the demurrer.

A third amended complaint and petition for writ of mandate dated November 17, 2023, alleged that Bakersfield operates several weirs in the Kern River in a manner that violates the law, including section 5937. That provision requires that dam owners allow sufficient water to pass through, over or around in order to keep fish in "good condition." (§ 5937.)

---

[6] Like many other documents, the complaint in the appellant's appendix does not bear a file stamp. However, it has a printed date at the signature block of November 30, 2022. While a file-stamped copy is much preferred, it is technically not required because "[f]iling an appendix constitutes a representation that the appendix consists of accurate copies of documents in the superior court file." (Cal. Rules of Court, rule 8.124(g).) See also Advisory Com. Com., Cal. Rules of Court, rule 8.124(d) [not requiring conformed copy so long as date is shown.]) Throughout this opinion we will use the dates on the signature blocks of various filings.

[7] Kern County Water Agency was not listed as it was added as a real party in interest in the second amended complaint.

*Motion for Preliminary Injunction*

BBTK and WAC filed a motion for a preliminary injunction dated August 10, 2023. The motion argued that the chronically dry riverbeds below each weir on the Kern River were prima facie evidence that Bakersfield was violating section 5937 and the Public Trust Doctrine. Accordingly, the motion sought injunctive relief "restrain[ing] the City from diverting water that is required to keep in good condition the fish that currently exist below each of the Weirs[.]" The motion stated that a "[r]emedy can be accomplished by a simple reiteration of the statutory directive without quantification of the amount of water required to satisfy the directi[ve]." A proposed order submitted with the motion would have prohibited Bakersfield from operating the weirs "in any manner that reduces river flows below a volume that is sufficient to keep fish downstream of said weirs in good condition." The motion also expressly stated that it was *not* seeking to change Bakersfield's management of the Kern River "allocations."

In support of the motion, plaintiffs sought and obtained judicial notice of a recirculated draft EIR for Kern River Flow and Municipal Water Program dated August 2016. The program sought to use up to 160,000 acre-feet "to create a permanent, consistent, and regular flow of water in the Kern River channel through the City[.]" The draft EIR indicated that Kern River obligations to Bakersfield's water treatment plants were 19,000 acre-feet annually, and obligations to "water feature amenities" were 5,000 acre-feet annually. Another "demand" on Bakersfield's Kern River water rights was an average of 20,000 acre-feet per year of canal seepage and evaporative losses. This did not include Bakersfield's legal obligations to provide water to other entities.

Bakersfield has rights to Kern River waters from a variety of legal sources. In a wet year, these rights may yield as much as 179,000 acre-feet from the Kern River. In a dry year, the rights may yield an average of 55,000 acre-feet from the Kern River, resulting in a median yield of 99,000 acre-feet.

10.

*Opposition*

The water agencies opposed the preliminary injunction motion, observing that it did not request a specific flow rate be imposed, nor did it identify any particular fish species. They argued such preliminary relief would be improper because injunctions "must be definite enough to provide a standard of conduct for those whose activities are proscribed, as well as a standard for the ascertainment of violations of the injunctive order by the courts called upon to apply it." (*Pitchess v. Superior Court* (1969) 2 Cal.App.3d 644, 651.)

The water agencies adduced evidence that NKWSD's supply from the Kern River is nearly 400,000 acre-feet in a wet year and 10,000 acre-feet in a dry year. NKWSD's annual agricultural water requirements are 160,000 acre-feet. The less water NKWSD gets from the Kern River, the more it has to rely on groundwater pumping.

Bakersfield also opposed the motion, offering a declaration from its Assistant Water Resources Director, Daniel Maldonado, asserting:

> "If Kern River diversions into unlined canals, including for the Kern Delta Water District, the North Kern Water Storage District and the City, are limited or interrupted, groundwater levels will decline, the underground drinking water supply will be negatively affected and potentially cause undesirable results. Groundwater quality will decrease, arsenic levels will likely increase, water delivery to customers will be impacted because the pumps cannot deliver the required quantity of water or maintain the proper pressure for drinking water, and health and safety issues will arise as the City's ability to provide a safe and reliable drinking water supply is threatened."

Mr. Maldonado also stated,

> "Any restrictions on the City's diversion of water would further threaten the City's ability to deliver water to its residents, particularly in the areas of the City not served by groundwater. Further, restrictions on diversions, as described above, will cause declines in groundwater levels, causing negative environmental effects and impacting the supply of groundwater available to serve Bakersfield residents. The requested injunction would therefore put the public health and safety of 400,000 residents at risk."

*Injunction*

On November 9, 2023, the court filed an order granting the motion for preliminary injunction. The injunction prohibited the City of Bakersfield "from operating the Beardsley Weir, the Rocky Point Weir, the Calloway Weir, the River Canal Weir, the Bellevue Weir, and the McClung Weir in any manner that reduces Kern River flows below the volume sufficient to keep fish downstream of said weirs in good condition." The order directed "defendant and plaintiffs" to engage in good faith consultation to establish flow rates necessary for compliance with this order." If said consultation was unsuccessful, either party could file a request for the court to "make a determination regarding compliance, impose specific flow rates, or make any other legal determination pertinent to the order, after reasonable notice to all parties including the Real Parties in Interest." The court also required plaintiffs to post a $1,000 bond.

The injunction did not set a specific flow rate that Bakersfield had to allow past the last weir. The court considered setting a specific flow rate, but decided against it for several reasons. The court said it would not countenance protracted disobedience of the statute and acknowledged "that entrusting Defendant and Plaintiff to determine the flow rates might be setting the process up for failure." However, the court concluded that the defendant and plaintiffs, with input from experts, were in a better position to develop a flow rate. The court also noted that Bakersfield had previously indicated a willingness to have the Kern River flow in its natural channel through the city. As a result of these various considerations, the court decided to have defendant and plaintiffs work together to establish a flow rate.

*Stipulation and Implementation Order*

On November 13, 2023, Bakersfield, WAC and BBTK filed a stipulation. The water agencies did not agree to the stipulation. The stipulation provided that Bakersfield would operate the weirs such that 40% of the total measured daily flow of the Kern River would be allowed to flow past the McClung Weir. This fish flow would be "subject to"

12.

Bakersfield's municipal needs and demands.  Any remaining flow would be available for diversion by real parties in interest.

The court signed an order implementing the stipulation the next day.  We will refer to this as the implementation order.

*Motions for Reconsideration*

The water agencies filed motions for the court to reconsider its orders granting the preliminary injunction and implementing the stipulation.  They made several arguments, including that "the Implementation Order was issued without any notice or opportunity to be heard by the Real Parties in Interest, who are the only parties potentially harmed by the Implementation Order."  They further contended that the Implementation Order improperly "provides for a new, first-priority diversion by Bakersfield" and that the interim flow regime was not supported by scientific evidence.

Bakersfield insisted that its agreement to elevating its own rights above the water agencies was made "in good faith."

BBTK and WAC responded that they were "agnostic" as to the issues of priority between the City and the water agencies.  They contended that the issues of priority between the City and the water agencies "are not part of this litigation."

*WAC's* Ex Parte *Application*

In an *ex parte* application dated December 18, 2023, WAC sought an "immediate order giving environmental flows of 200 cubic feet of water per second ("CFS") first priority to meet the bypass requirements of Fish and Game Code, section 5937 and other public trust interests."  The application indicated that plaintiffs had become aware that the Army Corps of Engineers planned to reduce discharges from Isabella Dam to 25 cubic feet per second.  WAC cited declarations from its experts stating that a flow of 200 cubic feet per second appeared to be sufficient to keep fish in good condition.

13.

*The January 9, 2024, Modification Order*

On January 9, 2024, the court ordered that the water agencies' motion for reconsideration and stay were "denied in part and granted in part." The order also denied WAC's *ex parte* application, and overruled several evidentiary objections submitted by the parties.

The court observed that "recent circumstances demonstrate the potential for exceptionally low periodic flow rates from Lake Isabella, requiring this Court to make at least a partial determination regarding priority of flows."

The order stated, in pertinent part:

"The Court's "ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION" filed on November 9, 2023 is hereby modified as follows (changes are in *italics*):

"IT IS HEREBY ORDERED THAT:

"1. Plaintiff's Motion for Preliminary Injunction is granted;

"2. Defendant City of Bakersfield and its officers, directors, employees, agents, and all persons acting on its behalf are prohibited from operating the Beardsley Weir, the Rocky Point Weir, the Calloway Weir, the River Canal Weir, the Bellevue Weir, and the McClung Weir in any manner that reduces Kern River flows below the volume sufficient to keep fish downstream of said weirs in good condition, *unless exempted by dire necessity to sustain human consumption through the domestic water supply*.

"3. Defendant, Plaintiffs, *and Real Parties in Interest* shall engage in good faith consultation to establish flow rates necessary for compliance with this order;

"4. The Court shall retain jurisdiction to ensure compliance with this order and to modify the terms and conditions thereof if reasonably necessitated by law or in the interests of justice. If after good faith consultation, Defendant, Plaintiffs, *and Real Parties in Interest* are not successful in agreeing to flow rates necessary for compliance, *any party* may file a request for this Court to make a determination

14.

regarding compliance, impose specific flow rates, or make any other legal determination pertinent to the order, after reasonable notice to *all the parties*;

"5. This order shall become effective immediately upon the posting of a bond in the amount of $1,000.00, or of cash or a check made out to the Clerk of the Kern County Superior Court in lieu thereof. The date and time of the posting of the bond, or of cash or a check in lieu thereof, shall be reflected in a Notice of Posting of Undertaking to be filed by Plaintiff and served on all parties.

"6. This order shall remain in place until the conclusion of trial, further order of this Court, or further order by a court of higher jurisdiction."

"10. The Court's 'Order for Implementation of Preliminary Injunction' filed on November 14, 2023 is stayed."

We will refer to the January 9, 2024, order as the modification order.

*Intervention of J.G. Boswell*

On January 18, 2024, appellant J.G Boswell moved to intervene in the case. Pursuant to a stipulation with plaintiffs, Boswell was joined to the action as a real party in interest on February 15, 2024.

## II.    LEGAL ISSUES

*Water rights*

In California, private parties cannot own water, but they can acquire the right to use water.  (Wat. Code, § 102.)  However, even the right to use water only extends to those uses of water that are "beneficial" and "reasonable."  (Cal Const., art. X, § 2.)

These water rights can arise through (1) ownership of land that is riparian (i.e., containing/bordering a watercourse), or (2) by appropriation.  (Wat. Code, §§ 101, 102.) After 1914, anyone seeking to appropriate water must get a permit or license from the State Water Resources Control Board ("Board").  (*Millview County Water Dist. v. State Water Resources Control Bd.* (2014) 229 Cal.App.4th 879, 889.)  However, the Board has no permitting or license jurisdiction over riparian or pre-1914 appropriative water

15.

rights.  (See *Young v. State Water Resources Control Bd.* (2013) 219 Cal.App.4th 397, 404.)

"[O]nce rights to use water are acquired, they become vested property rights." (*United States v. State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 101 (*United States*).)

This water rights regime operates alongside another legal principle: the public trust doctrine.

*Public Trust Doctrine*

From Roman and English common law comes "the concept of the public trust, under which the sovereign owns 'all of its navigable waterways and the lands lying beneath them "as trustee of a public trust for the benefit of the people." ' " (*National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 433-434 (*Audubon*).)  An important corollary to this premise is that "parties acquiring rights in trust property generally hold those rights subject to the trust, and can assert no vested right to use those rights in a manner harmful to the trust." (*Audubon*, *supra*, 33 Cal.3d at p. 437.)  It has been assumed "that 'trust uses' relate to uses and activities in the vicinity of the lake, stream, or tidal reach at issue[.]" (*Id.* at p. 440.)

The public trust doctrine operates simultaneously with the water rights regime, with neither completely yielding to the other.  (*Audubon*, *supra*, 33 Cal.3d at p. 445.)  Both are crucial to give effect to the diverse interests in the proper allocation of water. (*Id.* at p. 445.)  On the one hand, the state has a valid interest in preserving water courses for public trust purposes, including recreation and wildlife preservation.  On the other hand, "[t]he population and economy of this state depend upon the appropriation of vast quantities of water for uses unrelated to in-stream trust values." (*Id.* at p. 446.)

Consequently, "[t]he state has an affirmative duty to take the public trust into account in the planning and allocation of water resources, and to protect public trust uses whenever feasible." (*Audubon, supra,* 33 Cal.3d at p. 446.)  At the same time, "[a]s a

16.

matter of practical necessity[,] the state may have to approve appropriations despite foreseeable harm to public trust uses." (*Id.* at p. 446.)  "[A]nalysis of the public trust and reasonable use doctrines therefore must take into account not only the relevant environmental concerns, but also the beneficial uses served by [private] operations, the longevity and history of those operations, and the state policy favoring delivery and use of domestic water." (*Casitas Mun. Water Dist. v. U.S.* (2011) 102 Fed.Cl. 443, 459.)

*Fish and Game Code Section 5937*

One legislative expression of public trust values is section 5937.  (*California Trout, Inc. v. State Water Resources Control Bd.* (1989) 207 Cal.App.3d 585, 626 ("*Cal-Trout I*").)  That statute provides in its first sentence: "The owner of any dam shall allow sufficient water at all times to pass through a fishway, *or in the absence of a fishway, allow sufficient water to pass over, around or through the dam*, to keep in good condition any fish that may be planted or exist below the dam." (§ 5937, italics added.)

The statute can trace much of its language back to 1915, when the Legislature charged the state board of fish and game commissioners with examining all rivers and streams naturally frequented by fish.[8]  (Stats. 1915, ch. 491, § 1, p. 820.)  If the commissioners concluded fish could not pass freely over and around any dam, the "owners or occupants" of the dam were required to construct a fishway.  (*Ibid*.)  The owners or occupants were required to "allow sufficient water at all times to pass through such fishway to keep in good condition any fish that may be planted or exist below said dam or obstruction." (*Ibid*.)  In 1937, the present language extending the predecessor statute to "all releases of water 'over, around or through the dam' was enacted." (*Cal-Trout I*, *supra*, 207 Cal.App.3d at p. 600.)

---

[8] Other statutes concerning fish passage around or through dams existed even before that time.

17.

*Article X, Section 2*

*Text of Article X, Section 2*

In 1928, the electorate adopted a constitutional provision proposed by the Legislature concerning the use of water in California. (*Gin S. Chow, supra,* 217 Cal. at pp. 699-700.) This provision, currently designated article X, section 2 ("section 2"), was passed in response to a Supreme Court decision holding that the reasonable use doctrine was inapplicable as between a riparian right-holder and an appropriator. (*Cal-Trout I, supra,* 207 Cal.App.3d at p. 623.) However, section 2 as ultimately enacted is far broader in scope than the specific context of disputes between riparian-right holders and appropriators. The current provision, which is almost identical in text to its original state,[9] states, in part:

> "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water." (Cal. Const. art. X, § 2.)

Section 2 further provides that its terms may not be construed "as depriving any riparian owner of the reasonable use of water of the stream to which the owner's land is riparian under reasonable methods of diversion and use, or as depriving any appropriator of water to which the appropriator is lawfully entitled." (Cal. Const. art. X, § 2.)

---

[9] The provision was relocated, and a few instances of gendered language in the original were changed.

Section 2 concludes, "This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained." (Cal. Const. art. X, § 2.)

*Scope and Effect*

Section 2 declares that the right to use water "does not extend to unreasonable use or unreasonable method of use or … diversion of water." (*Peabody v. City of Vallejo* (1935) 2 Cal.2d 351, 367.) The mandates of section 2 "are plain, they are positive, and admit of no exception." (*Ibid.*) They "apply to the use of all water, under whatever right the use may be enjoyed" and to "every method of diversion." (*Ibid.*) Indeed, section 2's reasonable use requirement "is now 'the overriding principle governing the use of water in California.' " (*Light v. State Water Resources Control Bd.* (2014) 226 Cal.App.4th 1463, 1479 (*Light*).)

*Beneficial Use*

In addition to being reasonable, uses of water must be beneficial. The Legislature has expressly recognized several uses of water as beneficial. The highest use of water is "domestic purposes" (Wat. Code, § 106), such as drinking water, household uses, and domestic livestock. (*Prather v. Hoberg* (1944) 24 Cal.2d 549, 562; *Deetz v. Carter* (1965) 232 Cal.App.2d 851, 855.) The second highest use of water is for irrigation. (Wat. Code, § 106.) Other beneficial uses of water include recreation, and the preservation of fish and wildlife resources. (Wat. Code, § 1243, subd. (a).)

It is important to note that while these uses are sometimes expressed in a hierarchical fashion ("highest use," "next highest use"), that does not mean that the highest use always prevails to the greatest extent possible over a lesser beneficial use. The reason is that, in addition to being beneficial, all uses of water must also be reasonable. "The fact that a diversion of water may be for a purpose 'beneficial' in some respect …does not make such use 'reasonable' when compared with demands, or even future demands, for more important uses." (*Imperial Irrigation Dist. v. State Wat.*

19.

*Resources Control Bd.* (1990) 225 Cal.App.3d 548, 570-571 (*Imperial*).)  No single use of water– not even using water for domestic purposes – has an "absolute priority." (*Audubon, supra,* 33 Cal.3d at p. 447 fn. 30.)

*Traditional Versus Self-Executing Constitutional Provisions*

Crucial to this case is understanding what section 2 means when it establishes itself as self-executing.

Traditionally, constitutional provisions only operated upon the government. (*Rice v. Howard* (1902) 136 Cal. 432, 439.)  They established limitations on the power of the Legislature, outlined government functions, or directed that legislation be crafted. (See *Ibid*.)  However, around the turn of the 20th century, a different type of constitutional provision became common.  These provisions were "of a statutory character" (*id.* at p. 439.) and operated not only upon the Legislature, but also applied directly in court cases.  "These are in fact but laws, made directly by the people instead of by the [L]egislature, and they are to be construed and enforced in all respects as though they were statutes."  (*Ibid*.)

This is the essence of a self-executing constitutional provision.  Self-executing provisions are directly enforced by courts in individual cases like a statute.  (See *Environmental Defense Fund, Inc. v. East Bay Mun. Utility Dist.* (1980) 26 Cal.3d 183, 198.)  In contrast, non-self-executing constitutional provisions only manifest effect in court cases *indirectly* through, for example, the statutes they authorize, repeal or prohibit.

Section 2 operates both upon the Legislature *and* is to be applied directly in court cases like a statute.  First, it limits legislative authority by "supersed[ing] all state laws inconsistent therewith" (*Gin S. Chow, supra,* 217 Cal. at p. 700), and by prohibiting the Legislature from sanctioning manifestly unreasonable uses of water.  (See *Cal-Trout I, supra,* 207 Cal.App.3d at p. 625.)  Second, it directly governs decisions in individual court cases, like a statute.  Put another way, its provisions are "now the supreme law of the state, *which the courts are bound to enforce, and it must be made effectual in all*

20.

*cases* and as to all rights not protected by other constitutional guaranties." (*Gin S. Chow,*
*supra,* 217 Cal. at p. 700, italics added.)

*Court Determinations*

Consequently, whether a use of water is beneficial and reasonable under section 2
"is a judicial question to be determined in the first instance by the trial court." (*Gin S.*
*Chow, supra,* 217 Cal. at p. 706.)  This analysis involves multiple factors (see Water
Code § 100.5) and requires the court to engage in "a comparison of uses." (*Imperial,*
*supra,* 225 Cal.App.3d at p. 570.)

"What constitutes reasonable use is case-specific.  'California courts have never
defined ... what constitutes an unreasonable use of water, perhaps because the
reasonableness of any particular use depends largely on the circumstances.' " (*Santa*
*Barbara Channelkeeper v. City of San Buenaventura* (2018) 19 Cal.App.5th 1176, 1185
(*Channelkeeper*).)  "What may be a reasonable beneficial use, where water is present in
excess of all needs, would not be a reasonable beneficial use in an area of great scarcity
and great need.  What is a beneficial use at one time may, because of changed conditions,
become a waste of water at a later time." (*Tulare Irr. Dist. v. Lindsay-Strathmore Irr.*
*Dist.* (1935) 3 Cal.2d 489, 567.)  Reasonableness under section 2 is a question of fact,
and usually unresolvable on the pleadings. (*Channelkeeper*, *supra*, 19 Cal.App.5th at
p. 1185.)

Uses of water found to be unreasonable by the Supreme Court include
"flooding … land to kill gophers and squirrels … [citation]" and "the use of floodwaters
solely to deposit sand and gravel on flooded land [citation.]" (*Light*, *supra*,
226 Cal.App.4th at p. 1480.)

*Injunctions*

"We review an order granting a preliminary injunction under an abuse of
discretion standard, to determine whether the trial court abused its discretion in
evaluating the two interrelated factors pertinent to issuance of a preliminary injunction—

21.

(1) the likelihood that the plaintiff will prevail on the merits at trial, and (2) the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm the defendant is likely to suffer if the preliminary injunction were issued. [Citation.]  Abuse of discretion as to either factor warrants reversal."[10]  (*Alliant Ins. Services, Inc. v. Gaddy* (2008) 159 Cal.App.4th 1292, 1299 (*Alliant*).)

However, "[w]here the likelihood of prevailing on the merits depends upon a question of law such as statutory construction, the question on appeal is whether the trial court correctly interpreted and applied the law, which we review de novo."  (*Alliant, supra,* 159 Cal.App.4th at p. 1300.)

### III.    CONTENTIONS OF THE PARTIES

The parties have identified various issues for the court, including: (a) Did the trial court fail to properly consider whether the requested use of water was reasonable; (b) Whether an injunction, if any, issued on remand should set a manner of compliance; (c) Whether the appeal by the water agencies was timely; (d) Did the trial court fail to impose the type of undertaking required by Code of Civil Procedure section 529; (e) Whether the Implementation Order violated the due process rights of the parties; (f) Whether the appeals are moot; and (g) Whether the injunction or Implementation Order was non-appealable.  Each will be considered in turn.

---

[10] The water agencies cite cases indicating that appellate courts apply greater scrutiny to mandatory injunctions compared to prohibitory injunctions.  (See *Board of Supervisors v. McMahon* (1990) 219 Cal.App.3d 286, 295.)  This sets off a dispute about whether the injunction was indeed prohibitory or mandatory.  However, we conclude the injunction must be reversed on an issue of law even under the usual standard of review, and therefore do not delve into that dispute here.

22.

## IV. DISCUSSION

A. The Court Erred by Failing to Properly Consider Whether the Requested Use of Water was Reasonable

The trial court ruled that section 5937 is a "non-discretionary, specific legislative rule reflecting the public trust doctrine." Therefore, the trial court reasoned, "compliance with Section 5937 is compulsory, as is compliance with any other state law." As a result, the court expressly refused to consider potential harms to the City or water agencies in "determin[ing] the applicability of Section 5937 as an appropriate use of water."[11] The court held that the Legislature "already considered the competing uses of water when they passed Section 5937" and that the court was therefore without "jurisdiction" to reweigh competing interests.

Similarly, the Attorney General and California Department of Fish and Wildlife (CDFW), as amici, contend that "no reasonable use analysis is required" to adjudicate a violation of section 5937. BBTK similarly urges us to reject the notion that section 2's

---

[11] Specifically, the court's order stated: "It is important to note that the Court weighed the potential harms to the respective parties in this case *only on the procedural issue* of deciding whether a preliminary injunction should issue. *This discretionary analysis was not done as part of the process to determine the applicability of Section 5937 as an appropriate use of water. As discussed above, the State Legislature already considered the competing uses of water* when they passed Section 5937 and came down on the side of minimum flow requirements. Therefore, *this Court has no jurisdiction to override the State Legislature and re-weigh the competing interests when it comes to addressing the underlying, substantive issue.* On that point, compliance with Section 5937 is required as a matter of law." In our view, the court's refusal to consider impacts to all water users in its analysis of the "underlying, substantive issue" was error.

The court did consider other water users for a different issue – i.e., the balance-of-harms analysis for issuing an injunction. For example, the court acknowledged that the water agencies' overall water demands were unknown, but nonetheless concluded that the Kern River's average flow of "726,000 acre-feet is an enormous amount of water that should suffice for the reasonable use of all interested stakeholders." However, whether a water use is "reasonable" under section 2 is not the same determination as whether the balance-of-harms militates in favor or against issuing an injunction.

reasonableness requirement applies to using water to keep fish in good condition under section 5937. In its amicus brief, California Trout contends precedent does not support the assertion that water uses are always subject to judicial determinations of reasonableness. WAC insists that section 5937 requires sufficient water flows for fish without exception.

In contrast, appellants contend that the court failed to conduct the constitutionally required analysis of reasonableness. They disclaim any suggestion that "flows can never be determined to be required on the Kern River under Section 5937 due to the constitutional balancing of uses required in Article X, Section 2." They also disclaim any facial challenge to the constitutionality of section 5937.

On this issue, Bakersfield rejects the other respondents' position that section 5937 "automatically and necessarily requires a court to impose injunctive relief calling for a certain amount of flows without considering or accounting for other uses, needs and priorities, including domestic supplies and needs."[12]

*Analysis*

Under section 2, "[a]ll uses of water, including public trust uses, must now conform to the standard of reasonable use." (*Audubon*, *supra*, 33 Cal.3d at p. 443.) Because section 2 is self-executing, this reasonableness requirement "must be made effectual in all cases." (*Gin S. Chow*, *supra*, 217 Cal. at p. 700, italics added.) Consequently, a court must always consider reasonableness whenever it would direct or adjudicate a particular use of water, even when applying statutes that do not expressly incorporate a reasonableness determination. The court's failure to do so here was error.

Of course, this does not mean that statutes concerning the reasonable use of water, such as section 5937, are irrelevant or ineffectual. Applying the plain meaning of the

---

[12] Bakersfield nonetheless supports the injunction because Bakersfield supports increased flows in the Kern River (as long as Bakersfield still gets the water it needs).

24.

word "reasonable," it is clear that section 2 does not mandate a single, specific, optimal allocation of water among competing uses. Instead, it permits any of a number of water uses and allocations that fall within the rather broad limits of what is "reasonable" (and beneficial). When a statute requires a particular water use or allocation, the terms of the statute dictate the outcome unless section 2 requires otherwise (i.e., application of the statute alone would be a non-beneficial or unreasonable use of water).[13] Thus, the Legislature has a central role to play in how water is used in the state. One of the only limits to its power is the prohibition on unreasonable or non-beneficial uses of water. While this limit is modest, it *is* a limit, and is binding. Unreasonable or non-beneficial uses of water are never permitted under the Constitution, even if a statute would otherwise require it. (See *Gin S. Chow*, *supra*, 217 Cal. at p. 700 [Section 2 supersedes all state laws inconsistent therewith].)

BBTK observes that the last sentence of section 2 envisions the Legislature enacting laws in furtherance of its policy dictates.[14] It is true that the Legislature is empowered to enact statutes consistent with section 2. But this power does not alter the independent legal effect of section 2, which is a consequence of its self-executing nature. Thus, while the Legislature was certainly free to enact section 5937, it did not (and could

---

[13] This is the case unless superseded by another constitutional provision or federal law.

[14] Plaintiffs cite *Fullerton v. State Water Resources Control Bd.* (1979) 90 Cal.App.3d 590, for the proposition that section 2 "consists of a broad policy declaration that the waters of the state should be placed to beneficial use in reasonable and nonwasteful ways, and then in the last sentence clearly and expressly delegates to the Legislature the task of ascertaining how this constitutional goal should be carried out." However, we find that description incomplete. Section 2 permits the Legislature to enact laws "in furtherance" of its goals, but also declares that it is self-executing (in the same sentence no less). Since section 2 is self-executing, it has not delegated the subject matter entirely to the Legislature. Rather, section 2 imbues its own provisions with independent legal effect while also enabling the Legislature to enact complementary statutes.

not) alter the independent force of law exerted by section 2 on this and all other cases. And that independent force of law requires a consideration of reasonableness.

Where plaintiffs, amici and the trial court err is in concluding that because section 5937 reflects the Legislature's view of reasonableness, it is the *only* relevant manifestation of section 2's reasonableness principle in this case. This approach would perhaps be proper if section 2 were not self-executing. In that circumstance, the "reasonable" use of water would merely be a policy goal to be given specific effect *solely* through implementing legislation like section 5937. (See *Bautista v. State of California* (2011) 201 Cal.App.4th 716, 726-727 [non-self-executing provisions are public policy statements not directly enforced by judiciary].) Then courts would only apply section 5937 as the implementing statute, and not the text of section 2 itself. However, that is not the situation here because section 2 expressly states that it is self-executing. Consequently, while the Legislature is free to enact statutes that further section 2's goals, those statutes operate *alongside*[15] – rather than as the sole effective manifestation of – section 2's provisions.

BBTK also observes that section 5937 is a "valid" legislative enactment.[16] We agree. But section 2's restrictions on all uses of water in the state are also valid. Section 5937 requires dam owners to allow sufficient flows to keep fish in good condition, and section 2 prohibits all unreasonable uses of water. Together, these two legal authorities provide that the in-stream use of water to keep fish in good condition is required to the extent that use is reasonable.

To be clear, using water to keep fish in good condition will often be a reasonable use of water, depending on the circumstances. Indeed, it may well be a reasonable use of

---

[15] It may yield to section 2 if there is a conflict as applied to a particular case.

[16] In a related vein, BBTK claims appellants ask this court to declare section 5937 unconstitutional. However, appellants have not made a challenge to the facial constitutionality of section 5937.

26.

water in the present case; we make no determination on that issue here. The point is that no particular use of water is per se reasonable in *all* circumstances, and therefore reasonableness must always be evaluated before a court orders any particular water use. (See *Audubon, supra,* 33 Cal.3d at pp. 443, 447 fn. 30 [no use of water, including public trust uses, has an "absolute priority" over other uses].)

For example, it would be clearly unreasonable for the government to allocate all of the state's water resources to the use of preserving wildlife and natural beauty, and none whatsoever to human sustenance (i.e., drinking water and irrigating crops).[17] Similarly, allocating all of the state's water resources to agricultural irrigation, and none whatsoever to the preservation of the environment would be unreasonable. Moving away from these extremes, one eventually enters the broad spectrum of allocations/water uses that are "reasonable." If the result mandated by a water use statute is reasonable and beneficial, then the statute is applied by its terms – even if the court is of the opinion that other uses/allocations of water would be superior in some way. However, if the use/allocation of water is unreasonable, section 2 prohibits that use even if the statute would otherwise require it.

*Cal-Trout I*

Both parties cite to *Cal-Trout I*. In that case, several petitioners sought the rescission of licenses issued by the State Water Resources Control Board to the City of

---

[17] The Attorney General and CDFW reject a similar hypothetical offered by appellants where "the entire flow of the river had to be devoted to fish flow in order to preserve one fish, at the expense of all human use of water." They counter by saying that "[t]he trial court's application of the 'manifestly unreasonable' standard on remand, in determining the amount of flows needed to comply with Section 5937, will obviate the potential for any absurd results." But that is no answer to the hypothetical. The hypothetical is a situation where fish could *only* be kept in good condition by devoting the *entire* watercourse to fish flow at the expense of all human use of water. If this resulted in insufficient drinking water for humans, then using the water to comply with section 5937 would be unreasonable. In that situation, section 2 would not just limit the breadth of an injunction, it would prohibit an injunction altogether.

27.

Los Angeles and one of its departments. (*Cal-Trout I, supra,* 207 Cal.App.3d at p. 592.) The licenses validated the diversion of water from four creeks through dams for domestic uses and power generation in Los Angeles.

The petitioners relied on section 5946, which required certain licenses in District 4 ½ to be conditioned "upon full compliance with Section 5937." (*Cal-Trout I, supra,* 207 Cal.App.3d at p. 592.) Los Angeles mounted what the appellate court called an "implied facial challenge to [section 5946's] constitutional validity." (*Id.* at p. 593.)

The court rejected Los Angeles's contention. The court observed that, even under section 2, the Legislature had broad authority to legislate in the area of water usage. However, the court acknowledged this authority was "not unlimited," in that the Legislature could not enact "a statute [that] sanctioned a manifestly unreasonable use of water[.]" (*Cal-Trout I, supra,* 207 Cal.App. 3d at p. 625.) The court concluded the "Legislature's policy choice of the values served by a rule forbidding the complete drying up of fishing streams in Inyo and Mono Counties in favor of the values served by permitting such conduct as a convenient, albeit not the only feasible, means of providing more water for L.A. Water and Power, is manifestly not unreasonable." (*Ibid.*) Consequently, the statute was not rendered unconstitutional by section 2.

We find much to commend *Cal-Trout I*. We agree with its emphasis on the broad discretion granted to the Legislature in this area, and its acknowledgment of the modest limitations section 2 does impose on legislative power.[18] However, that case largely

---

[18] We do not deny that applying section 2 has important policy implications for courts, and that concepts like "reasonable" and "unreasonable" can be difficult to define. But nearly all cases acknowledge that judicial determinations of reasonableness come into play *at some point*. (See *Cal Trout I*, *supra*, 207 Cal.App.3d at p. 625.) At the end of the day, it remains one of the oldest jobs of the judiciary to determine the meaning and application of the Constitution – a document which often speaks in generalities. (See, e.g., *Clausing v. San Francisco Unified School Dist.* (1990) 221 Cal.App.3d 1224, 1238 [unelaborated constitutional right to "privacy" is self-executing].) As a result, "what is a reasonable or unreasonable use of water is a judicial question to be determined in the first instance by the trial court." (*Gin S. Chow, supra,* 217 Cal. at p. 706.) It is often a

28.

concerned itself with the constitutionality of section 5946 (and, by extension, section 5937). However, as we have noted above, section 2 is not *merely* a limitation on the Legislature's power. Consequently, the conclusion that section 5937 is constitutional does not end the role of section 2 in a water use case. In our view, its provisions must also be given direct legal effect in individual cases like a statute.

BBTK also cites language from a federal district court case indicating that, through section 5937, "the Legislature has already balanced the competing claims for water…and determined to give priority to the preservation of their fisheries." (*Natural Resources Defense Council v. Patterson* (E.D. Cal. 2004) 333 F.Supp.2d 906, 918 ("*Patterson*"); see also *California Trout, Inc. v. Superior Court* (1990) 218 Cal.App.3d 187, 201 ("*Cal-Trout II*").) But the fact that section 5937 is one expression of the Legislature's policy preferences does not alter the fact that section 2 must nonetheless be applied in this and every case. Often, applying section 2 will ultimately pose no barrier to the full implementation of the Legislature's water policy. But the fact remains that any use of water a California court might order must be reasonable, even if a statute would otherwise require an unreasonable use of water in a particular case.

We also note that immediately after the section cited by BBTK, *Patterson* states that the "priority" established by section 5937 "must be reconciled with" another law applicable in that case, the Central Valley Project Improvement Act. (*Id*. at p. 918, fn. 7.) The court ultimately found the two laws compatible, but the acknowledged need for

---

difficult job, but no more so than "determining probable cause, reasonable doubt, reasonable diligence, preponderance of evidence, a rate that is just and reasonable, public convenience and necessity, and numerous other problems which in their nature are not subject to precise definition but which tribunals exercising judicial functions must determine." (*Ibid*.)

Moreover, many of these same concerns would apply to *Cal-Trout I*'s principle that section 2 prevents the Legislature from sanctioning a "a manifestly unreasonable use of water."

29.

reconciliation shows that section 5937 does not always and necessarily trump all other legal authorities applicable to a given case.

Moreover, *Patterson* does not analyze or apply section 2, so it offers little guidance or precedent on the core issue presented in this case. Additionally, as a federal district court case discussing a state statute, *Patterson* is not binding on this court.

Finally, *Patterson* was applying section 5937 but was citing language from *Cal-Trout II* that addressed section 5946. We do acknowledge that *some* of the reasoning from the *Cal-Trout* cases applies to section 5937. However, this particular language from *Cal-Trout II* cannot be exported wholesale from section 5946 to section 5937. The opinion stated that the Legislature "already balanced the competing claims for water *from the streams affected by section 5946* and determined to give priority to the preservation of their fisheries." (*Cal-Trout II, supra,* 218 Cal.App.3d at p. 201.) And section 5946 applies expressly and exclusively to District 4 ½, which spans portions of Mono and Inyo counties. (§ 11012.) "[T]he bill by which…the predecessor to section 5946, became law carried an urgency clause explaining its necessity. It said: '*Proposals for diversions of water in District 4 ½* are *now being considered* which, if effected will destroy all of the fish in large sections of the streams *in that district* and interfere with the economy *in [an] area which is dependent to a large extent on recreation*. It is necessary that this act take effect immediately to prevent further destruction of the fish life *in District 4 ½.*' (Sen. Bill No. 78 (1953 Reg.Sess. as introduced Jan. 6, 1953…)" (*Cal-Trout I*, *supra*, 207 Cal.App.3d at p. 601, italics altered.) Thus, section 5946 does reflect a consideration of the specific tradeoffs applicable to "streams in *that* district" and ultimately a choice to prioritize fisheries in that area. Just because section 5946 reflects the Legislature's balancing of the specific, localized needs pertaining to the streams of District 4 ½ does not mean the Legislature engaged in a similar determination as to all waterways statewide under section 5937.

*Conclusion*

In sum, because of section 2, no judicial adjudication of competing water uses is complete until the court assesses whether the use is beneficial and reasonable. Since the reasonable-use requirement applies to all uses of water in the state – including in-stream public trust uses like the one envisioned by section 5937 – the trial court's approach of applying only the terms of section 5937 without giving direct effect to the reasonableness provisions of section 2 as to the "underlying, substantive issue" of this case was error.

On remand, the court must determine whether and to what extent using the waters of the Kern River to keep fish in good condition is a reasonable and beneficial use of water under section 2. Such a determination looks to the totality of the circumstances, which include effects on fish and other wildlife (Wat. Code, § 1243, subd. (a)), recreation (*ibid.*), water quality, the transportation of adequate water supplies where needed (*United States, supra,* 182 Cal.App.3d at p. 130), water supplies for the domestic needs of people such as the residents served by the City of Bakersfield (Wat. Code, § 106), irrigation (Wat. Code, § 106), effects on other users of the watercourse[19] (*In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339, 354), and any effects on "appropriations essential to the economic development of this state" (*Audubon*, *supra*, 33 Cal.3d at p. 445; see also *Gin S. Chow*, *supra*, 217 Cal. at pp. 701-702).

B. If, After Performing the Analysis Required by this Opinion, the Court Issues Another Preliminary Injunction, the Injunction Should Set the Manner of Compliance

While we are reversing the order on other grounds, we will briefly address the parties' contentions regarding whether the injunction was sufficiently definite.

---

[19] This would include the increased flood risks Boswell claims will result from an injunction. Boswell may raise these claims on remand for the court to consider in its reasonable use analysis.

31.

A court directive that requires one to " 'guess at its meaning and differ as to its application violates the first essential of due process of law.' " (*In re Berry* (1968) 68 Cal.2d 137, 156.) Consequently, " 'an injunction must not be uncertain or ambiguous and the defendant must be able to determine from the order what he may and may not do.' " (*City of Redlands v. County of San Bernardino* (2002) 96 Cal.App.4th 398, 415.) For example, courts may not issue broad injunctions simply requiring that the defendant " 'obey the law.' " (*Id.* at p. 416; see *Cook v. Craig* (1976) 55 Cal.App.3d 773, 786; see also, *Long Beach Memorial Medical Center v. Kaiser Foundation Health Plan, Inc.* (2021) 71 Cal.App.5th 323, 343.)

It is the burden of the party seeking injunctive relief to formulate the nature of the remedy sought. (*O'Connell v. Superior Court* (2006) 141 Cal.App.4th 1452, 1481 (*O'Connell*).) The moving party must show not only that they are entitled to a preliminary injunction, but also that they are entitled to the particular breadth of injunctive relief sought. (See *Anderson v. Souza* (1952) 38 Cal.2d 825, 843 (*Anderson*).)[20]

Here, the parties dispute whether the court erred in failing to set a flow rate requirement in the injunction. Specifically, the injunction did not say *how much* water Bakersfield must let flow past the weirs in order to keep downstream fish in good condition. Instead, the injunction broadly required that the weirs not be operated in a "manner that reduces Kern River flows below the volume sufficient to keep fish downstream of said weirs in good condition."

---

[20] BBTK reverses this burden, arguing it is *not* their burden "to prove how much water is required to keep fish in good condition, but rather the burden of the parties wishing to divert water from a river to prove that their diversions will not be in violation of the law before those actions are taken." Not so. BBTK, as moving parties, bears the burden of proving entitlement to the injunctive relief they seek. (See *O'Connell, supra,* 141 Cal.App.4th at p. 1481; see also, *Anderson, supra,* 38 Cal.2d at p. 843.)

Of course, if the trial court decides not to issue the preliminary injunction on remand, this point is moot. However, we will offer some guidance in case the court does decide to issue some form of preliminary injunction on remand.

First, we think we understand what the court was trying to achieve by its January 9, 2024, order. A flow rate set by agreement of all the parties would have some advantages to one set unilaterally by the court. However, such an agreement may be unlikely.

Moreover, the reasonableness analysis required by section 2 requires at least an estimate of how much water previously used for domestic consumption, irrigation, etc., will now be dedicated to the in-stream public trust use embodied in section 5937. This is because the reasonableness of a particular use of water depends, in part, on how much water is being committed to that use (and thereby being rendered unavailable for other beneficial uses).

Consequently, if the court issues an injunction on remand, it would be advantageous to immediately set an objective standard for compliance upon a proper showing by the moving parties. (*Cal-Trout II*, 218 Cal.App.3d at p. 209 [appropriate for court to hold hearing to determine "amount of water that must be released to attain compliance with the statute"].) The court could impose a particular volume of flow or a percentage of natural flows, so long as the requirement is reasonable[21] and supported by substantial evidence that it would keep fish in good condition. Such a standard would respect the parties' due process rights by explaining exactly how to comply with the injunction. Additionally, it will properly place the burden on the moving parties to formulate – and prove entitlement to – the specific injunctive relief being requested. (See

---

[21] Even if the trial court concludes the injunction should be granted, the reasonableness requirement would also be relevant in determining a flow rate. For example, it would likely be an unreasonable use of water to devote substantially more water to fish flows than necessary to keep fish in good condition.

*O'Connell , supra,* 141 Cal.App.4th at p. 1481; see also, *Anderson, supra,* 38 Cal.2d at p. 843.)  Finally, it will place the trial court in a better position to quickly hold parties accountable and prevent further harm to fish in case of non-compliance.

BBTK points out that the trial court's approach of having the parties meet and confer would avoid protracted litigation and "disobedience of the statute."  While encouraging collaboration between the parties is undoubtedly a useful goal, the chronology here is problematic.  The trial court granted the injunction and then had the parties confer as to appropriate flow rates.  But knowing at least an estimate of what flows are needed to keep fish in good condition is a prerequisite for evaluating whether the injunction can be granted in the first place.  This is because determining whether a water use is reasonable under section 2 depends on the facts of the case.  A particular use of water when the supply is plentiful may become unreasonable when supply is lower.  Without a grasp on how much water the injunction would take from the other uses to which it was previously being put, the court cannot properly perform the "comparison of uses" (*Imperial*, *supra*, 225 Cal.App.3d at p. 570) analysis required by section 2.  Consequently, in our view a consideration of reasonableness cannot be deferred until the remedy stage, as the Attorney General and CDFW suggest.

C. The Water Agencies' Appeal of the Bond was Timely

The water agencies next challenge the court's decision to require only a nominal bond of $1,000.  BBTK first responds that the appeal of that decision was untimely.  Not so.[22]

_____

[22] We also reject WAC's argument that appellants waived their objections to the nominal bond by failing to "brief" the modification order.  The water agencies challenge the setting of a nominal bond which was effected by the injunction order, not the modification order.  And as to that issue, appellants have thoroughly briefed the matter. That they do not assert this argument against the modification order – which made no changes to the bond whatsoever – does not effect a forfeiture or waiver of their challenge to the injunction order's setting of a nominal bond.

Unless a statute or rule provides otherwise, a notice of appeal must be filed on or before the earliest of: (1) 60 days after the court clerk serves the judgment or notice of entry of judgment, (2) 60 days after a party serves the prospective appellant with the judgment or notice of entry of judgment, (3) 180 days after entry of judgment.  (Cal. Rules of Court, rule 8.104(a)(1).)[23]

One rule that "provides otherwise" is rule 8.108.  (See rule 8.104(a)(1) ["Unless … rule[] 8.108… provide[s] otherwise, a notice of appeal must be filed[.]]"]) Under that rule, if a party serves and files a motion for reconsideration, the time for appeal is extended to the earliest of: (1) 30 days after the court clerk or a party serves an order (or notice of order) denying the motion, (2) 90 days after the first motion to reconsider is filed, (3) 180 days after entry of the appealable order.  (Rule 8.108(e).)  We will calculate each of these dates to determine the earliest.

The record contains a notice of entry of the order denying (in part) the motion for reconsideration, bearing the date January 17, 2024.  Thirty days later would be February 16, 2024.

The water agencies filed their motion for reconsideration on November 21, 2023. Ninety days later would be February 19, 2024.

Finally, the order granting the injunction and imposing the nominal bond (i.e., the appealable order) was filed on November 9, 2023.  One-hundred and eighty days later would be May 7, 2024.

The earliest of these three dates is February 16, 2024. Therefore, February 16, 2024, was the deadline to file a notice of appeal here.  (Rule 8.108(e).)  The water agencies' notices of appeal were filed on January 18, 22, 30, 31, and February 1, 2024.

---

[23] Subsequent rule references are to the California Rules of Court.

D. The Trial Court Erred in Failing to Impose the Type of Undertaking Required by Code of Civil Procedure Section 529

"On granting an injunction, the court or judge *must* require an undertaking on the part of the applicant to the effect that the applicant will pay to the party enjoined any damages, not exceeding an amount to be specified, the party may sustain by reason of the injunction, if the court finally decides that the applicant was not entitled to the injunction." (Code Civ. Proc., § 529, subd. (a), italics added.)  There are four exemptions from this requirement: (1) dissolution of marriage proceedings, (2) injunctions under the Domestic Violence Prevention Act, (3) most government officials/entities, and (4) injunctions against distributing sexually explicit images/videos of another.  (*Id.*, subd. (b).)  There is no stated exemption for environmental litigation.  (*Ibid.*)

BBTK says state courts have not addressed whether courts are precluded from ordering a nominal bond or waiving the bond requirement entirely.  But the statute itself quite clearly addresses whether a court may dispense with the bond requirement when it says courts "must" (Code Civ. Proc., § 529, subd. (a)) require an undertaking, except in certain enumerated circumstances that are not present here.

Not only does the statute preclude waiver of the bond requirement altogether, it also precludes nominal bonds.  The statute specifically requires that the court require an undertaking "to the effect that the applicant will pay to the party enjoined any damages … the party may sustain by reason of the injunction[.]"  (Code Civ. Proc., § 529, subd. (a).) This means "the trial court's function is to estimate the harmful effect which the injunction is likely to have on the restrained party, and to set the undertaking at that sum." (*Abba Rubber Co. v. Seaquist* (1991) 235 Cal.App.3d 1, 14 (*Abba Rubber*).) Nominal bonds untethered to potential damages do not satisfy this requirement.

BBTK cites to older federal cases as a "useful guide" suggesting nominal injunction bonds are permissible in environmental litigation.  (See *People of State of Cal. ex rel. Van De Kamp v. Tahoe Regional Planning Agency* (9th Cir. 1985) 766 F.2d 1319,

36.

1325 (*Tahoe Regional Planning Agency*); *Friends of the Earth, Inc. v. Brinegar* (9th Cir. 1975) 518 F.2d 322, 323.) We question how useful these cases are, as they were employing a different standard. (See *Tahoe Regional Planning Agency*, *supra*, 766 F.2d at p. 1325 [Federal Rules of Civil Procedure required security " 'in such sum as the court deems proper.' "].)

In any event, Code of Civil Procedure section 529 expressly addresses the situations where it does not apply. It lists four exemptions across a variety of contexts, and environmental litigation is not one of them. (See Code Civ. Proc., § 529, subd. (b).) Whether it should be is an argument for the Legislature, not the courts.[24] We cannot insert an exception to Code of Civil Procedure section 529, regardless of its merits as a matter of public policy. (See Code Civ. Proc., § 1858.)

Consequently, we direct that "[n]o further preliminary injunction shall be issued unless its issuance is conditioned upon the furnishing of an adequate undertaking. We do not purport to determine what an adequate amount would be. Rather, we leave that determination to the trial court[.]" (*Abba Rubber*, *supra*, 235 Cal.App.3d at p. 22.)

---

[24] BBTK observes that damage to the environment is often irreversible. But most preliminary injunctions involve the prospect of irreversible damage. (See *City of Torrance v. Transitional Living Centers for Los Angeles, Inc.* (1982) 30 Cal.3d 516, 526; *7978 Corporation v. Pitchess* (1974) 41 Cal.App.3d 42, 46.) Yet bonds "must" be imposed all the same. (Code Civ. Proc., § 529, subd. (a).)

Moreover, the moving party will only need to pay the enjoined party "if the court finally decides that the applicant was not entitled to the injunction." (Code Civ. Proc., § 529, subd. (a).) In other words, only when it turns out there was no environmental damage, or that the enjoined party did not cause it, etc.

In any event, whether to add environmental litigation to subdivision (b) of Code of Civil Procedure section 529 is a question for the Legislature, not the courts.

E.  The Implementation Order Violated the Due Process Rights of Real Parties in Interest

*Law*

"[O]nce rights to use water are acquired, they become vested property rights.  As such, they cannot be infringed by others or taken by governmental action without due process[.]"  (*United States, supra,* 182 Cal.App.3d at p. 101.)  At a minimum, due process requires notice and an opportunity to be heard.  (*Menefee & Son v. Department of Food & Agriculture* (1988) 199 Cal.App.3d 774, 781.)

*Stipulations*

A stipulation is a voluntary agreement between opposing parties concerning some relevant point.  (STIPULATION, Black's Law Dictionary (12th ed. 2024).)  Like any other agreement or contract, it is essential that the parties or their counsel assent to the terms of a stipulation.  (*Palmer v. City of Long Beach* (1948) 33 Cal.2d 134, 142.)  "A stipulation does not affect parties who do not enter into it."  (See 3 Cal.Jur.3d (2024) Agreed Case and Stipulations, § 40.)

*Analysis*

The court's November 14, 2023, order was a clear violation of the due process rights of the real parties in interest.[25]  Despite over a century of contracts, settlements and court decrees governing the rights to the waters of the Kern River, the implementation order established an interim regime whereby Bakersfield would receive the water needed for its "municipal needs *and demands*" before the water agencies received any of their contracted water.  In this way, the order affected the water delivery rights of some parties (i.e., the water agencies) on the basis of a stipulation made *solely* by other parties

_____

**25** Appellants also suggest the order was improper under rule 3.1312 because there was no longer a pending motion before the court.  We do not rely on this ground in reversing the order.

(plaintiffs and Bakersfield). Indeed, it was an agreement whereby a stipulating party apparently stood to benefit at the expense of the non-stipulating parties.

*Status of the Water Agencies as Parties*

Here, Bakersfield argues that the water agencies are not "actual parties" to the case at all, and are only referred to in the operative complaint as real parties in interest. Bakersfield offers no legal authority for the proposition that a real party in interest named in the complaint and possessing a legitimate interest in the case is not truly a party to an action. (See *Sonoma County Nuclear Free Zone v. Superior Court* (1987) 189 Cal.App.3d 167, 173-175.) Moreover, it was Bakersfield that argued in its demurrer below that the water agencies were necessary and indispensable parties to this action. Importantly, the court sustained the demurrer on that ground and the complaint was amended to again include the water agencies. They are undoubtedly parties to this action.

Moreover, even if the water agencies should not be considered "parties" to the present action, that would actually *undermine* the trial court's jurisdiction to alter their water delivery rights. Surely the court would be on *less* tenable ground altering the contractual rights of a non-party rather than a party.

Finally, the immediate issue is not whether the water agencies are considered parties *to the action*. Instead, the true issue is whether they needed to be parties *to the stipulation* before it could be used as the basis for detrimentally altering their water delivery rights.

*The Implementation Order Plainly Affected the Water Agencies*

Bakersfield next asserts the implementation order does not mention or reference the appellants. This is, quite simply, not true. The implementation order stated:

> "Bakersfield will implement, on an interim basis, an Interim Flow Regime ("Interim Flow Regime") for the Kern River whereby forty percent (40%) of the total measured daily flow of available water will remain in the river channel past the McClung Weir, subject to Bakersfield's municipal needs and demands (currently 130,000 acre-feet per year, with an average daily flow of 180 cubic feet

39.

per second ("cfs")).  By way of example, using the average annual Kern River flow as stated in the Ruling on page 14 of 726,000 acre-feet per year, which converts to approximately 1,000 cfs average daily flow, Bakersfield will multiply that amount by 40% to arrive at 400 cfs to be left in the river for interim fish flows.  Bakersfield will allocate 180 cfs of the 1000 cfs flow for the City's demands, leaving a balance of 820 cfs. 400 cfs will be left in the river for fish flows, and the remaining 420 cfs of flow (1,000 cfs minus 180 cfs and 400 cfs) would be available for diversion by *the Real Parties in Interest.*"  (Italics added.)

The implementation order expressly references the water agencies (i.e., the real parties in interest).  And in so doing, it expressly subjugates their diversions of Kern River waters to the "municipal needs and demands" of Bakersfield.  The suggestion that the implementation order "only…restricted Bakersfield" and did not restrict or limit the water agencies is plainly contradicted by the record.

### *Bakersfield's Claim of Good Faith Conduct*

Bakersfield questions how it could be viewed as having made a self-interested deal since it was merely complying with the trial court's order to consult on flow rates.  The answer is that the stipulation Bakersfield submitted to the trial court did more than establish a flow rate.  It *also* granted Bakersfield a top-priority interim right to water, with the water agencies receiving water only after Bakersfield's needs and demands were met.  It is this aspect of the order that apparently benefited Bakersfield at the expense of the water agencies without their assent.

### *An Opportunity to Participate in Discussions Does not Obviate Need for a Party to Agree to Stipulation Arising from those Discussions*

In a later order, the court said that the injunction "did not require the Real Parties in Interest to participate in the good faith consultations because they do not operate the weirs subject to the injunction."  Perhaps that explanation would suffice if the implementation order had only touched upon operation of the weirs.  However, it also granted Bakersfield an interim top-priority right to water deliveries, and provided that the

40.

water agencies would only receive water thereafter. This aspect of the order clearly required the water agencies' agreement to the stipulation.[26]

The later order also said there was some evidence the water agencies were invited to participate in the consultation contemplated by the implementation order, but declined. But participation in the consultation is not the same as agreeing to a particular stipulation. Even if the water agencies had an opportunity to attend the consultations, that does not mean they are bound to agreements made solely by other parties at, or as a result of, those consultations.

*Requested Relief*

We also note the implementation order granted relief that the motion did not request. The motion expressly stated that it was *not* seeking to change the City's management of the "allocations" of Kern River waters. Plaintiffs reiterated their position in response to the motions for reconsideration, observing that the issues of priority between the City and local water agencies "are not part of this litigation." Nonetheless, the implementation order established that the City's use of water for "municipal needs and demands" would be satisfied before the water agencies would receive their contracted water.[27]

*Water Agencies' Ability to Participate in Hearing on Motion Does not Suffice*

This fact undermines Bakersfield's next contention. Bakersfield suggests that the water agencies' opportunity to participate at the hearing on the motion for preliminary

---

[26] Alternatively, there could be a motion/petition/complaint in court seeking such relief with a proper legal and factual basis, and an opportunity to be heard on the issue.

[27] In defending the implementation order, Bakersfield notes that the court did not know what the water agencies' overall annual water demand was. Bakersfield faults the water agencies for this fact. But, again, the motion for preliminary injunction did not seek an alteration in the respective priorities of the water delivery rights of Bakersfield and the water agencies. Consequently, any alleged failure to rebut the factual predicates of such an alteration cannot be used to defend the implementation order.

injunction was sufficient due process.  Perhaps that would be true if the motion for preliminary injunction sought alteration of the water agencies' rights relative to Bakersfield.  That would put the water agencies on notice that they needed to oppose that request for relief at the hearing.  But instead, the motion did the opposite, stating that "[t]he relief sought is narrowly focused.  It does not seek to change the City's management of the Kern River allocations[.]"  Consequently, the hearing on the motion did not afford the water agencies sufficient opportunity to oppose altering the allocations of Kern River waters because the motion offered no notice such relief was being requested (and instead disclaimed such relief).

### *The Fact that Section 5937 Might Result in Less Water for Users Does not Grant Court Authority to Alter the Relative Priority of Claims as Between Users*

WAC argues that the various water delivery contracts are subject to the "legal priority" of statutes like section 5937.  We agree that courts may, in some circumstances, require water to flow past a dam even though such an order would make full satisfaction of private water delivery contracts impossible.  But section 5937 does not address how that shortfall is to be distributed among the water users.  Thus, the implementation order went beyond the authority granted by section 5937 by altering the priority of rights *between* Bakersfield and the water agencies. Section 5937 requires that sufficient water flow past a dam – it does not alter who is entitled to the water that so passes.  The consequences of any shortfall are governed by other bodies of law, including the various water contracts, water rights licenses and any other applicable statutes.  As plaintiffs themselves have quite correctly observed previously, the issues of priority between the City and local water agencies "are not part of this litigation."

Bakersfield also contends, "[t]he trial court's protection and prioritization of Bakersfield's domestic water supplies and needs, over the lower priority diversions of Appellants for agricultural uses, was consistent with, supported by, and, in fact *required*, by well-established California statutes establishing a priority for domestic uses of water

42.

over agricultural uses." (Italics added.) This argument is profound in scope, but erroneous. It posits that statutory water use preferences *require* courts to alter the respective water delivery rights established by existing contracts and prior court decrees, in order to ensure a statutory "higher use" is satisfied before a lower one. This is incorrect. For one, the statutory policy in favor of domestic purposes (Wat. Code, § 106) is followed shortly thereafter by an explanation that "[t]he declaration of the policy of the State in this chapter is not exclusive, and all other or further declarations of policy in th[e Water] code shall be given their full force and effect." (Wat. Code, § 107.)

Second, while domestic use is prioritized over all other uses, irrigation is similarly prioritized over all other uses except domestic ones. (Wat. Code, § 106.) Applying Bakersfield's reasoning, Bakersfield should get all of the water needed for domestic purposes *and the water agencies should get all of the water needed for irrigation* before *any* water is devoted to keeping fish in good condition. But that is not how the law of water use works. No single use of water – not even using water for domestic purposes – has an "absolute priority."[28] (*Audubon, supra,* 33 Cal.3d at p. 447 fn. 30.)

Finally, even if water use preference statutes operated in the manner suggested by Bakersfield (they do not), judicial relief would still be subject to procedural prerequisites. Judicial relief could only be granted after either an agreement of *all* affected parties, or after a prayer for relief in a proper petition or complaint and an opportunity for all parties to be heard. Here, there is no stipulation signed by all parties altering the relative priority

---

[28] To be clear, the Legislature's preference for domestic uses of water, followed by irrigation, must be taken into account by courts determining the reasonable use of water. What we reject is the categorical approach that the highest hierarchical use of water must be satisfied in full before the next highest use can be accommodated to any extent.

of water rights between Bakersfield and the water agencies, nor has there been a prayer for such relief followed by an opportunity for all parties to be heard on the issue.[29]

F. The Appeal is not Moot

Finally, plaintiffs suggest that the appeals of the implementation order are moot because the trial court stayed it in the modification order.

"A case becomes moot when events ' "render[ ] it impossible for [a] court, if it should decide the case in favor of plaintiff, to grant him any effect[ive] relief." ' " (*In re D.P.* (2023) 14 Cal.5th 266, 276 (*D.P.*).)

We acknowledge that the modification order remedied at least some of the due process issues present in the implementation order. But that does not render a challenge to the implementation order moot. The modification order stayed, rather than vacated, the implementation order. Stays, of course, can be lifted. Indeed, Bakersfield requests in this very appeal that the implementation order be reinstated. Thus, the implementation order still exists. And since appellants are requesting on appeal the order be vacated, rather than merely stayed, it is clear they have not yet received the relief they currently seek. We can grant effective relief by reversing the implementation order and thereby prevent it from being "un-stayed." Consequently, the appeal of the implementation order is not moot.

In any event, "[e]ven when a case is moot, courts may exercise their 'inherent discretion' to reach the merits of the dispute." (*D.P., supra,* 14 Cal.5th at p. 282.) We will exercise that inherent discretion here. If the implementation order is truly of no effect in light of the modification order, as plaintiffs suggest, then they must concede our reversal of the implementation order causes no harm. Conversely, if our reversal of the

---

[29] Bakersfield notes that the court set water pumping rates in *County of Inyo v. City of Los Angeles* (1976) 61 Cal.App.3d 91. But that was done after an evidentiary hearing on that exact issue. (*Id..,* at p. 94.)

44.

implementation order accomplishes something beyond the trial court's stay, then plaintiffs must concede the appeal is not moot.**30**

*Conclusion*

It was error for the court to grant relief that was not requested by the moving parties pursuant to a stipulation that did not include the parties to be apparently disadvantaged thereby. Accordingly, we reverse the implementation order.

G. The Modification Order did not Render the Injunction or Implementation Order Non-Appealable

WAC argues that because the modification order was appealable, it rendered the injunction and the implementation order *non*-appealable.

First, WAC emphasizes that an order denying a motion for reconsideration is not separately appealable. However, the rule that denials of reconsideration are not *separately* appealable is only material when a party attempts to appeal only the denial of reconsideration and not the underlying order. Here, appellants did appeal the underlying orders. When a party appeals the underlying order, denial of reconsideration *is* reviewable. (Code Civ. Proc. § 1008, subd. (g).)

WAC next observes that orders granting reconsideration are separately appealable. As a result, WAC argues the injunction and implementation order are not appealable. There are several problems with this contention. First, appellants' arguments on the merits are largely directed to issues on which reconsideration was *not* granted – e.g., the granting of an injunction requiring Bakersfield to operate the weirs in a manner that keep downstream fish in good condition, and the setting of a nominal bond.

Second, the fact that an order granting reconsideration (in part) happens to quote text from a prior order, does not render the prior order non-appealable. To the contrary,

---

**30** In contrast, WAC's argument in its respondent's brief that the injunction should not be stayed on appeal is moot, because we are reversing the injunction. Moreover, this issue was previously addressed in writ of supersedeas proceedings in this court.

an attack on an injunction is properly brought as an appeal to the injunction, not an appeal of the modifications to the injunction. The modification order was not an injunction itself. It was a modification of an existing injunction. The modification order makes this clear, stating the injunction "is hereby *modified* as follows (changes are in italics):" (Italics added.) Its verbatim quotations of the injunction were offered not to establish another injunction of independent force and effect, but instead to provide context for the italicized provisions the court *was* adding to/deleting from the injunction. In other words, the substance and effect of the modification order is embodied in its italicized text, not the unchanged quotations from the injunction.[31]

Even if the modification order's verbatim quotations of the original injunction were meant to have some substantive effect beyond providing context for what the order was actually accomplishing through its italicized text,[32] that effect would obviously be to *deny* reconsideration as to the unaltered text.[33] Such denials are cognizable on appeal from the underlying orders.[34] (See Code Civ. Proc. § 1008, subd. (g).)

---

[31] Moreover, even if the modification order were non-reviewable in this appeal, the reversal of the underlying reviewable order would render its modifications meaningless and ineffectual.

[32] This is a premise we do not accept.

[33] In their motion for reconsideration, the water agencies argued "The California Constitution's mandate for reasonable use requires consideration of all relevant facts and circumstances and the balancing of all the relevant interests. [Citations.] The Court must require that evidence be brought before it on a properly noticed motion, with opportunity for all parties to be heard and to present evidence regarding these critical questions."

[34] As a result of our conclusions in the previous sections of this opinion, we do not address the remaining contentions.

## DISPOSITION

The order dated November 9, 2023, granting a preliminary injunction and setting a nominal bond is reversed.  The order dated November 14, 2023, implementing the preliminary injunction is reversed.  The matter is remanded for proceedings consistent with the views expressed in this opinion.  Appellants are awarded costs.


                                                            SNAUFFER, J.

WE CONCUR:


DETJEN, Acting P. J.


PEÑA, J.